# 24-1412-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

➤➤ ◄◄

AL INFINITY LLC,

*Plaintiff-Appellant,*

*v.*

HERSCHEL SPALTER, ISSER BOYARSKY, DOES 1-10,

*Defendants-Appellees,*

CROWN CELL INC.,

*Defendant-Third-Party-Plaintiff-Appellee,*

WESTVIEW INDUSTRIES, INC.,

*Third-Party-Defendant.*

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

Jeffrey S. Dweck
THE LAW FIRM OF JEFFREY S. DWECK, P.C.
*Attorneys for Plaintiff-Appellant*
43 West 33rd Street, Suite 304
New York, New York 10001
212-967-0500



PHP (212) 719-0990 appeals@phpny.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Appellant AL Infinity LLC ("AL INFINITY") certifies that AL INFINITY has no parent corporation and that no publicly held corporation owns ten percent or more of AL INFINITY's corporate stock.

TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................5

STATEMENT OF JURISDICTION...................................................8

STATEMENT OF THE ISSUES PRESENTED ......................................8

STATEMENT OF THE CASE..................................................11

BACKGROUND AND FACTS ....................................................11

PROCEDURAL POSTURE .................................................17

ARGUMENT ....................................................................18

    I.  Summary Judgment Standard................................................18

    II.  Appeal Standard ...............................................................20

    III. Elements of Plaintiff's Primary Claims ......................................21

    A.  Trademark Infringement Under Section 32(1) of the Lanham Act ...........21

        1.  Ownership of the Altec Lansing Trademarks ....................................22

        2.  Use of the Altec Lansing Trademarks................................................22

        3.  Likelihood of Consumer Confusion...................................................24

        B.  False Advertising and Unfair Competition Under
Section 43(a)(1)(B) of the Lanham Act ...............................................27

        C.  Injury to Reputation and New York State Anti-Dilution
In Violation Of New York State General Business
Law Section 360-l ..................................................................29

    IV. The District Court erred in denying Plaintiff summary
judgment and in granting summary judgment against the
Plaintiff; the issues of counterfeiting and trademark
infringement should have been resolved in favor of Plaintiff
as a matter of law or, at minimum, given to a jury to find.........................31

A.  The court below did not give enough weight to Plaintiff's
    Evidence ............................................................................................31

    1.  Isaac Franco's Testimony was sufficient to at least shift
        the burden to Defendants........................................................31

    2.  The Court below also did not give enough weight to Isser
        Boyarsky's own statements and/or suggested that emails
        constituted inadmissible hearsay ..........................................37

        a.  Emails were corroborated by the testimony of Isser
            Boyarsky; the court below also failed to distinguish
            between emails among Isser Boyarsky, who testified
            at his depositions as to the email content, and emails
            between Mr. Steinberg and his factory, Fenda............................37

        b.  Emails fell into a hearsay exception .............................................42

            i.  Business Record Exception ...................................................42

            ii.  Statement Against Interest .....................................................47

B.  The Court below gave too much weight to unauthenticated,
    incomplete, stale and outdated agreements with non-parties to
    this case (an alleged "affiliate" of Defendant's factory, not the
    factory itself) ......................................................................................48

    1.  The Agreements Weren't Agreements At All. They Were
        Incomplete and Outdated. ....................................................48

    2.  There is no evidence on the record indicating that the
        "Fenda" party to the said "Agreements" was an affiliate
        of Defendants' current manufacturer. .................................48

    3.  The "Agreements" are simply inapplicable to Crown
        Cell's (and Westview's) sale without a license and,
        hence, infringement ..............................................................52

C.  The District Court Also Gave Too Much Weight to Copyright
    Notices ................................................................................................52

D.  The District Court erred in demanding strictly admissible evidence to defeat Defendants' Motion for Summary Judgment.................................................................53

E.  The Exhaustion Doctrine Is Of No Avail In This Case ...........................56

V.  The District Court erred by allowing Defendants' response to a cease and desist letter – itself hearsay being used to prove the truth of its content – to constitute evidence of non-willfulness.................................................................63

VI. The District Court erred in dismissing trademark causes of action *sua sponte* and not allowing the trademark claims to survive even if there was no counterfeiting. ...............................65

CONCLUSION .................................................................69

Certification per Fed. R. App. P. 32(a)(7)(C) ........................................70

TABLE OF AUTHORITIES

Cases

1-800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400, 406 (2d Cir. 2005) ............................ 22

4 Pillar Dynasty LLC v. N.Y. &amp; Co., 933 F.3d 202 (2nd Cir. 2019) ............................. 63, 65

Abbott Labs. v. Adelphia Supply USA, No. 15-CV-5826 (CBA) (LB), 2019 WL 5696148, at *7 (E.D.N.Y. Sept. 30, 2019) ...................................................................................................... 24

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .. 18, 20, 56

Axtria, Inc. v. Oks Group, LLC, 2021 WL 6136600 (E.D. Pa.) .................................................. 55

Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994) ................................................. 53

B.V. v. Asiarim Corporation, No. 12 Civ. 928 (RJS), — F. Supp. 2d —, 2013 WL 6987165, at *10 (S.D.N.Y. Dec. 16, 2013) .................................................................................................. 26

Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995) ................................ 63

Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano, No. 03 Civ. 0015 (RWS), 2005 WL 1595285, at *7–8 (S.D.N.Y. July 6, 2005) ............................................................................... 28

Bath and Body Works Brand Mgmt., Inc. v. Summit Enter., LLC, 7 F.Supp.3d 385, 399 (S.D.N.Y. 2014) ..................................................................................................................... 30

Bel Canto Design, Ltd. v. MSS Hifi, Inc., 837 F. Supp. 2d 208, 222 (S.D.N.Y. 2011) ............... 57

Bill Blass, Ltd. v. SAZ Corp. ........................................................................................................ 60

Bowmar Instrument Corp. v. Continental Microsystems, Inc., 497 F. Supp. 947, 959 (S.D.N.Y. 1980) ........................................................................................................................... 26, 66

Burberrys (Wholesale) Ltd. v. After Six Inc., 471 N.Y.S.2d 235, 122 Misc.2d 561 (N.Y. Sup. Ct. 1984) ..................................................................................................................................... 66

Burger King Corp. v. Mason, 710 F.2d 1480 (11th Cir.1983) .................................................... 66

Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985) ................................................................................................................................................ 54

Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).. 19, 20

By Design PLC v. Ben Elias Indus. Corp., No. 98 Civ. 4588 (LAP), 1998 WL 998964, at *4 (S.D.N.Y. July 15, 1998) .................................................................................................... 59

Century 21 Real Estate LLC v. Destiny Real Estate Properties LLC et al, No. 4:2011cv00038 - Document 17 (N.D. Ind. 2011) ........................................................................................... 36

Chanel Inc. v. WGACA, Inc., No. 18-cv-2253 (LLS), 2022 WL 902931, at *15 n. 9 (S.D.N.Y. Mar. 28, 2022) ..................................................................................................................... 65

Church of Scientology Int'l v. Elmira Mission of the Church of Scientology, 794 F.2d 38, 44 (2d Cir. 1986) ............................................................................................................................ 66

Coach, Inc. v. Allen, No. 11 Civ. 3590 (CM), 2012 WL 2952890, at *7 (S.D.N.Y. July 19, 2012) ................................................................................................................................................ 25

Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 205 (2nd Cir. 1979) ......................................................................................................................................... 26, 67

Deere & Co. v. MTD Products, Inc., 41 F.3d 39, 43 (2d Cir. 1994) ........................................... 30

Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir. 1998) ....................................... 20, 21

El Greco Leather Products Co. v. Shoe World, Inc., 806 F.2d 392, 396 (2d Cir. 1986) ........ 22, 23

Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc. , 507 F. App'x 26, 31 (2d Cir. 2013) ............. 64

Gallagher v. Delaney, 139 F.3d 338, 347 (2d Cir. 1998) ........................................................... 19

General Elec. Co. v. Speicher, 877 F.2d 531 (7th Cir. 1989) ..................................................... 36

5

GMA Accessories, Inc. v. BOP, LLC, 765 F. Supp. 2d 457, 463 (S.D.N.Y. 2011), aff'd sub nom. GMA Accessories, Inc. v. Elec. Wonderland, Inc., 558 F. App'x 116 (2d Cir. 2014)....... 22, 24

Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000) ...................................................... 19

Green v. Town of East Haven, 952 F.3d 394, 406 (2d Cir. 2020)................................................ 56

GTFM, Inc. v. Solid Clothing, Inc., 215 F.Supp.2d 273, 301 (S.D.N.Y. 2002).......................... 29

H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005 (2d Cir. 1989) 62

Holtz v. Rockefeller & Co.,258 F.3d 62, 75 (2d Cir. 2001) ........................................................ 19

In re Oil Spill, No. MDL2179, 2012 WL85447, at *3 (E.D. La. Jan. 11, 2012) .......................... 44

Island Software & Comput. Serv., Inc. v. Microsoft Corp. , 413 F.3d 257, 263 (2d Cir. 2005) .. 64

Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 156 (2d Cir. 2009) ........................................... 19

Junjiang Ji v. Jling Inc., 2019 WL 1441130 (E.D.N.Y. 2019) ................................................... 54

Kaytor v. Electric Boat Corp., 609 F.3d 537, 546 (2d Cir. 2010) .............................................. 20

Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc., 979 F. Supp. 224, 230 (S.D.N.Y. 1997).... 58

Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008)........ 53

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ............................................................................................................. 55

Microban Prods. Co. v. Api Indus., Inc., 14 Civ. 41 (KPF) (S.D. N.Y. May 08, 2014)........ passim

Mktg. Products Mgmt., LLC v. Healthandbeautydirect.com, Inc., 333 F. Supp. 2d 418, 432 (D. Md. 2004).............................................................................................................................. 59

Morisseau v. DLA Piper, 532 F. Supp. 2d 595, 621 n.163 (S.D.N.Y. 2008) .............................. 43

New World Trading Co. Ltd. v. 2 Feet Productions, Inc., Nos. 11-cv-6219, 13-cv-1251, 2014 WL 988475, at *1 (S.D.N.Y. Mar. 13, 2014) ........................................................................ 46

New York Stock Exchange, Inc. v. New York, New York Hotel LLC, 293 F.3d 550, 558 (2d Cir. 2002) .................................................................................................................................... 30

Nike Inc. v. Top Brand Co. Ltd., No. 00 Civ. 8179 (KMW)(RLE), 2005 WL 1654859, at *9 (S.D.N.Y. Jul. 13, 2005) ..................................................................................................... 29

O.D.F. Optronics Ltd. v. Remington Arms Co., Inc., No. 08 Civ. 4746 (DLC), 2008 WL 4410130, at *13 (S.D.N.Y. Sept. 26, 2008).......................................................................... 61

Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 76, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)................................................................................................................................... 21

Penberg v. HealthBridge Mgmt., 823 F. Supp. 2d 166, 187 (E.D.N.Y. 2011)...................... 43, 44

Petrosino v. Bell Atlantic, 385 F.3d 210, 219 (2d Cir. 2004)............................................... 20, 21

Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961) ........................... 24, 25

Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) ................................................................................................................................... 20

Polymer Technology Corp. v. Mimran, 975 F.2d 58, 61 (2d Cir. 1992) .......................... 57, 58, 61

Procter & Gamble Co. v. Quality King Distrib., Inc., 123 F. Supp. 2d 108, 113 (E.D.N.Y. 2000) ............................................................................................................................................. 23

Professional Golfers Ass'n v. Bankers L. & C. Co., 514 F.2d 665 (5th Cir.1975)...................... 66

Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980).................... 20

Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ................................................................ 53

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)......................................................................................................................... 19, 20

Rogers v. HSN Direct Joint Venture, No. 97 Civ. 7710 (LLS), 1999 WL 728651, at *2-3 (S.D.N.Y. Sept. 17, 1999)................................................................................................... 61

Ryan v. Volpone Stamp Co., Inc., 107 F. Supp. 2d 369, 400 (S.D.N.Y. 2000) ................... passim

Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc., a former licensee properly invoked the exhaustion doctrine where the parties had executed a post-termination agreement providing for a sell-off period of unsold inventory. 632 F. Supp. 1525, 1529 (S.D.N.Y. 1986) ................................... 61

Selvam v. Experian Info. Solutions, Inc., 15-1264 (2nd Cir. Jun 07, 2016)................................ 54

Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 114 (2d Cir. 2009).................. 30

State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc., 425 F.3d 708 (9th Cir. 2005). ................................................................................................................................................. 36

Sunward Elec., Inc. v. McDonald, 362 F.3d 17, 25 (2d Cir. 2004) ....................................... 23, 24

U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185 (6th Cir. 1997) ............................... 36

United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134 (3rd Cir.1981) ............................. 66

United States v. Stein, No. S1 05 Crim. 0888 (LAK), 2007 WL 3009650, at *1 (S.D.N.Y. Oct. 15, 2007) ................................................................................................................................... 43

VKK Corp. v. National Football League, 244 F.3d 114, 118 (2d Cir. 2001) ............................... 21

Vuitton et Fils, S.A. v. Crown Handbags, 492 F. Supp. 1071, 1076 (S.D.N.Y. 1979) aff'd, 622 F.2d 577 (2d Cir. 1980). ...................................................................................................... 23

Yan v. Zhou, 2021 WL 4059478 (E.D.N.Y.) ............................................................................... 54

Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 243 (2d Cir. 2009).......................................... 58

## Statutes

1338............................................................................................................................................... 9

15 U.S.C. § 1114(1) ................................................................................................................. 23, 24

15 U.S.C. § 1117(b) ..................................................................................................................... 24

15 U.S.C. §1114 ........................................................................................................................... 18

15 U.S.C. 1125(a) .................................................................................................................... 18, 28

18 U.S.C. § 2320 .......................................................................................................................... 37

28 U.S.C. § 1291 ............................................................................................................................ 9

28 U.S.C. § 1367 ............................................................................................................................ 9

28 U.S.C. §§ 1331 .......................................................................................................................... 9

## Other Authorities

Joint Statement on Trademarking Counterfeiting Legislation, 130 Cong. Rec. H12076, H12079 (daily ed. Oct. 10, 1984) .................................................................................... 38

## Rules

Fed. R. Evid. Rule 804................................................................................................................... 48

Fed. R. Evid. Rule 803(6) ....................................................................................................... 43, 45

Fed.R.Civ.P. 56(a) ................................................................................................................... 19, 54

Fed.R.Civ.P. 56(e) Advisory Committee Note (1963) ................................................................ 20

## Treatises

10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil § 2721 at 361 (3d ed. 1998) ............................................................................................................................... 54

Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, 4 Federal Rules of Evidence Manual, § 803.02[7] (11th ed. 2015) ................................................................................ 44

## STATEMENT OF JURISDICTION

This is an appeal from a series of three Decisions and Orders, dated August 9, 2023, September 14, 2023 and May 1, 2024. The District Court had jurisdiction over this federal question pursuant to 28 U.S.C. §§ 1331 and 1338 because the action arose under the Lanham Act, 15 U.S.C. § 1051 et seq. ("Lanham Act"). The District Court had supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. This appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(4). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because this is an appeal from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES PRESENTED

This case centers around the well-known consumer electronics brand, Altec Lansing® and the Defendants' sale online of suspect Alter Lansing® product without a license to do so. Despite a clear record which indicates that no defendant had a direct license to import and offer for sale Altec Lansing® product, the District Court granted the defendants summary judgment, improperly finding that the plaintiff did not prove its case as a matter of law and, secondly, improperly finding that the plaintiff did not raise a triable issue of fact. The plaintiff/appellant cross-moved for summary judgment, on the basis that the Defendants could not make a showing of consent, which motion was improperly denied.

Plaintiff/Appellant contends that the District Court erred in not affording proper weight to the plaintiff's *prima facie* case and by failing to shift to the defendants the burden of proving they had a legal right to import and manufacture product under the Altec Lansing® brand name. The District Court also afforded too much weight to the defendants' bare and meager showing, essentially an imaginary and fanciful theory.

Plaintiff made a clear and undisputed showing that it owns the Altec Lansing® trademark, that the product at issue was being offered for sale online and that it never gave a license to any defendant. None of that is in dispute. The defendants, in response, presented three (3) stale, unauthenticated, incomplete, vague and outdated "agreements" with non-parties to this case, alleging that "affiliates" of defendants' manufacturer had permission from Altec predecessors-in-interest over a decade earlier to manufacture and that third-party defendant Westview was a sales representative for Altec Lansing® product many years ago (2003-2009).

For the reasons set forth herein, the District Court should have afforded no weight to the said "evidence" and should have granted plaintiff summary judgment. At minimum, the District Court should have found that material issues of fact needed to be decided by a jury.

AL Infinity raises the following issues on appeal and asks this Court to vacate the district Court's order and judgment, reverse its summary judgment ruling and either grant AL Infinity summary judgment or remand for a trial.

1. Did the District Court err in denying Plaintiff summary judgment and in granting summary judgment against the Plaintiff; should the issues of counterfeiting and trademark infringement have been resolved in favor of Plaintiff as a matter of law or, at minimum, given to a jury to find based on material issues of fact in dispute?

2. Did the District Court err by giving too much weight to three (3) unauthenticated, incomplete, stale, vague and outdated non-party "agreements" which should have been deemed irrelevant to this case?

3. Did the District Court err in not giving enough weight to Plaintiff's Evidence? Was Plaintiff's testimony sufficient to at least shift the burden of proof to Defendants? Did the District Court err by not considering that counterfeiting and trademark infringement may be proven by circumstantial evidence?

4. Did the District Court not give enough weight to Defendant Isser Boyarsky's own statements?

5. Did the District Court improperly suggest that emails constituted inadmissible hearsay not subject to a hearsay exception? Even if they

10

were, did the District Court err by not considering hearsay to at least defeat summary judgment?

6. Did the District Court err by allowing Defendants' response to a cease and desist letter – itself hearsay being used to prove the truth of its content – to constitute evidence of non-willfulness?

7. Did the District Court err by dismissing trademark causes of action *sua sponte* and not allowing the trademark claims to survive even if there was no counterfeiting?

## STATEMENT OF THE CASE

### Background and Facts

This case involves the sale online of consumer electronics under the well-known Altec Lansing® brand. The specific items in question are two models of an audio speaker (the "AL Infringing Product"). (A4, A217-A218, A241-A262) There is no dispute that the Defendants knowingly sold Altec Lansing® consumer electronics through e-commerce channels (A33, A58) knowing they had no direct license from the Plaintiff to do so. (A303, et seq.) The speakers in question were manufactured and sold by a Chinese factory, Shenzhen Fenda Technology Co., Ltd. ("Shenzhen Fenda") to the third-party defendant Westview, a United States supplier (A164-A165, A174, et seq.) who, in turn, sold the goods to Defendant Crown Cell (A26, A217-A218). Crown Cell is a company comprised in part of

11

two individuals (A47, A24), at least one of whom worked with purchasing returned and refurbished electronics before joining Crown Cell (A46) and dealing in Altec Lansing® product (A289). Crown Cell sold approximately 10,000 of these speakers online (A27) knowing it had no right or license to do so.

Dozens of emails but also the deposition testimony of Defendant Isser Boyarsky – all of which were submitted as exhibits to the Plaintiff's moving papers – demonstrate that the goods were made to order, i.e. manufactured at the direction of the Defendants at the time of the alleged purchase and resale by the Defendants of the subject goods. This makes them not only infringements, but counterfeits.

**The Parties**

AL Infinity, LLC ("Infinity" or "Plaintiff") is a Delaware limited liability company with an office in New York City. (A301) Defendant Crown Cell is a New York corporation with its principal executive office located in Florida. (A286) Crown Cell is a privately held business that operates online marketplaces, including on Amazon.com, where it sells a variety of products retail to consumers located throughout the world. (*Id.*) Defendant Herschel Spalter is an individual residing in Florida. (*Id.*) and has been employed by Crown Cell since the company's founding in January 2014. (*Id.*) Defendant Isser Boyarsky is an individual residing in New York (*Id.*), employed by Crown Cell since 2016. (*Id.*) Third-Party Defendant

Westview Industries, Inc. ("Westview") serves as a middleman or a manufacturer's representative for the sale of electronics. (*Id.*)

## The Trademarks

AL Infinity is the owner of the Trademarks Altec Lansing® and the 'Altec Lansing' Horn Design Trademark" (hereinafter, the "Altec Lansing trademarks") (A300) and the Altec Lansing trademarks have been in use in commerce since at least as early as 1956. (A302). Infinity actually acquired the Altec Lansing trademarks in 2012. (A300)

## The Purchases

Starting in March 2016, Boyarsky exchanged emails with Allen Steinberg of Westview in which Westview identified certain products, including the Altec Lansing VS4621 and BXR1220 speakers, that were available for sale. (A136-A143, A70) The AL Infringing Products were desktop speaker systems. (A242, et seq.; A253, et seq.) Crown Cell placed its first order for 1,378 units of the VS4621 Altec Lansing® speaker in late March 2016 and was told by Westview that it expected "to have completion on the VS4621" by early May 2016. (A139-A140) When asked about what "completion" meant, Boyarsky testified that he "pictured that [the manufacturer] had the products sitting on shelves. All the parts were there. Everything was there. It just had to be packaged." (A71-A72) This is not proven or factual in any way, just something "he pictured" based on the typical 5-week

13

lead time which he – conveniently and without explanation – said was relatively short. (A71)  Plaintiff, on the other hand, contended that the 5-week lead time was exactly the smoking gun the District Court should have considered.[1]  That, or that "packaging" parts constitutes a material part of manufacturing and finishing product such that by Boyarsky's own admission, counterfeiting had taken place.

Later, in September of 2016, Steinberg emailed Boyarsky about the availability of "new products that are produced in the same factory as the VS4621 and BXR1220 speakers," and stated that "[w]e cannot use the Altec name on these, but have the ability to use whatever brand you can supply." (A73, A145 and, generally, A146-A160, emphasis added)  Between March 2016 and January 2017, Westview purchased from Shenzhen Fenda and sold to Crown Cell a total of 10,456 units of Altec Lansing products comprised of two speaker models, VS4621 and BXR1220 (A27, A69, A135, et seq.).  A summary of these sales is undisputed and is on the record.  (A134-A135; A54-A55; A66-A69; A26-A27)

### The AL Infringing Products and Defendants' Intent

The AL Infringing Products were shipped to Crown Cell from Shenzhen Fenda directly. (A164-A165, A174; A75-A76; A29-A30))  Samples in Crown Cell's inventory allegedly show that the AL Infringing Products included the following

---

[1] Isaac Franco – a seasoned, decades-long importer, testified to just that.  (A321) It was actually corroborated on one of Defendants' documents, an alleged "agreement" at A102 ("Forecasts and projections") (See A104, A106 (¶2.3), A108( ¶5.3)).

copyright notices "©2012 Altec Lansing, LLC," "©2010 Altec Lansing, LLC," and "©2008-2010 Altec Lansing, LLC". (A212-A214; A79-A81; A34-A35)    The District Court gave weight to this, notwithstanding that copyright notices merely date a copyright creation and evidence only that the product at issue was not manufactured <u>before</u> 2008; <u>not</u> that the product <u>was</u> manufactured before 2014.  In other words, this is a fact completely irrelevant to dating the manufacture of the product in question in this case and yet, was afforded weight by the District Court.

Email correspondence from March 2016 refers to "minimum builds…to be met for the models." (A137-A138 and A349, A353)  Emails from April 2016 also suggest that work in process needed "completion." (A140, A160)  In a September 2016 email, a "lead time" of 35 days for the Altec Lansing® speaker was quoted. (A364, A358-A359; A383-A385, A389-A393)   "Factory Production Times" and "Lead Times for Production" are mentioned in emails from December 2016. (A366-A367)  It is important to note that Defendant Boyarsky knew next to nothing about Shenzhen Fenda or how they operate. (A343, A345, A347, A361-A362)  Defendant Boyarsky admitted that he was not at the factory during production. (A360)  Defendant Boyarsky did not know whether Allen Steinberg from Westview even went to visit Shenzhen Fenda. (A347)

Email correspondence between Westview (Crown Cell's supplier) and Shenzhen Fenda from March 2017 obtained during discovery (and prior, when

Plaintiff pursued Westview) corroborate all of the foregoing, as do emails between Defendants and Westview, which begin with a discussion of when "production can be completed." (A394, A373)

Westview asked Shenzhen Fenda about being "able to produce" and "lead time." (A393, A373) Correspondence that followed tracks the entire negotiation for and production of the subject infringing goods. Westview again references "completion of production" in an email from September 2016. (A375-A396, A373)

Shenzhen Fenda in September 2016 admitted that they do not have all of the required parts in stock. (A390) They mentioned "new materials." (A389) In September 2016 Westview again mentioned completion of production ("Hope you can push up the production and complete as quickly as possible") and asked that the goods "get built as quickly as possible." (A388)

### Crown Cell's Sales of the AL Infringing Products

In late 2016 or early 2017, Crown Cell began offering the AL Infringing Products for sale on its online marketplaces on Amazon.com and Walmart.com. (A58-A59; A33) Crown Cell sold at least 6,705 of the AL Infringing Products to end customers. (A215; A77-A78) The infringing product was being offered on Walmart.com. The product was never in Plaintiff's product line and had not been in the prior "Altec Lansing" brand owner's line for years.

### Infinity's Demand Letter and Crown Cell's Prompt Cessation of Sales

On May 4, 2017, Infinity sent a cease and desist letter to Crown Cell. (A166) In the letter, Infinity alleged that Crown Cell's "sale and offering for sale of [the AL Infringing Products] constitutes trademark infringement, unfair competition and dilution in violation of federal and state statutes and common law. (*Id.*). One day later, on May 5, 2017, Crown Cell responded to the cease and desist letter via email stating "[p]lease be advised that we have purchased Altec Lansing speakers from Allen Steinberg at West-view industries he has a very close relationship with the infinity group and we have forwarded this to him. He assured us he will reach out the the [sic] infinity group and will resolve any issues. . . . For time being we have removed our listings from Walmart,com." (A169, A63) The District Court erred when it considered this response as proof of non-"willfulness."

## PROCEDURAL POSTURE

The Plaintiff brought five causes of action including among them (1) Federal trademark counterfeiting in violation of section 32 of the Lanham Act, 15 U.S.C. §1114; (2) Trademark infringement under 15 U.S.C. 1125(a); (3) Injury to business reputation and state anti-dilution in violation of Section 360-1 of the New York General Business Law and others.

17

After the close of discovery, the Defendants filed a motion for summary judgment <u>as to the counterfeiting claim only</u>. The Plaintiff/Appellant opposed the Defendants' motion and filed a cross-motion for summary judgment.

The Court below, after several rounds of briefing and follow-up submissions, in a combined three (3) decisions (2 Orders and a letter in between), denied Plaintiff's cross-motion, granted Defendants' motion and extended summary judgment *sua sponte* to the causes of action not raised in Defendants' motion, dismissing the entire Complaint.

Appellant brings this appeal because, for the reasons stated herein, the Court below erred in doing so. Appellant asks this Court to review the motions *de novo* and either grant Plaintiff its cross motion for summary judgment or remand this case for a trial on its merits before a jury.

## ARGUMENT

### I. Summary Judgment Standard

The granting of summary judgment is proper only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(a).* "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)* ("Liberty

Lobby"). "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *Fed.R.Civ.P. 56(e) Advisory Committee Note (1963).*

The " '[e]valuation of ambiguous acts' " is a task " 'for the jury,' " not for the judge on summary judgment. *Holtz v. Rockefeller & Co.,258 F.3d 62, 75 (2d Cir. 2001) (quoting Gallagher v. Delaney, 139 F.3d 338, 347 (2d Cir. 1998), abrogated in part on other grounds by Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)* " 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' " *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505).* The court's role in deciding a motion for summary judgment "is to identify factual issues, not to resolve them." *Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 156 (2d Cir. 2009)* ("Jasco Tools") *(emphases added); see, e.g., Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).*

Summary judgment is inappropriate when the admissible materials in the record " 'make it arguable' " that the claim has merit. *See, e.g., Jasco Tools, 574 F.3d at 151 (quoting Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438,*

445 (2d Cir. 1980)). On such a motion, "[t]he evidence of the non-movant is to be believed," *Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505;* all permissible "inferences are to be drawn in [its] favor," *Id.*; and the court "must disregard all evidence favorable to the moving party that the jury is not required to believe," *Reeves, 530 U.S. at 151, 120 S.Ct. 2097.* "In sum, summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, 'there can be but one reasonable conclusion as to the verdict,' " *Kaytor v. Electric Boat Corp., 609 F.3d 537, 546 (2d Cir. 2010) ("Kaytor") (quoting Liberty Lobby, 477 U.S. at 250, 106 S.Ct. 2505),* " i.e., 'it is quite clear what the truth is,' " *Kaytor, 609 F.3d at 546 (quoting Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)).*

## II.    Appeal Standard

These principles also govern this Court's review of a grant of summary judgment, which is conducted *de novo. See, e.g., Kaytor, 609 F.3d at 546; Petrosino v. Bell Atlantic, 385 F.3d 210, 219 (2d Cir. 2004)* ("Petrosino"); *Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir. 1998)* ("Distasio").

Where "[s]ummary judgment was granted for [one party], ... we must take the facts alleged by the [other] to be true." *Ellerth, 524 U.S. at 747, 118 S.Ct. 2257;see, e.g., Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 76, 118*

*S.Ct. 998, 140 L.Ed.2d 201 (1998); Distasio, 157 F.3d at 61* ("the non-movant will have [its] allegations taken as true" (internal quotation marks omitted)). And we are "obliged ... to assume that all factual disputes would be resolved in her favor at trial." *Petrosino, 385 F.3d at 214 n. 2.*

Appellant respectfully asks this Court to reviewing this claim *de novo*, interpreting the evidence in the light most favorable to the non-moving party. *Id., VKK Corp. v. National Football League, 244 F.3d 114, 118 (2d Cir. 2001).*

## III.    Elements of Plaintiff's Primary Claims

A. Trademark Infringement Under Section 32(1) of the Lanham Act

AL Infinity asserts that Defendants infringed the Altec Lansing® trademarks in violation of the Lanham Act when it promoted the sale of Altec Lansing®-branded products and distributed them for sale on Walmart.com and Amazon (among possibly other places).  The Lanham Act prohibits the unauthorized "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." *15 U.S.C. § 1114(1)(a).* To succeed in establishing liability for infringement under the Lanham Act, a plaintiff must prove: (1) that it owns a valid, protectible trademark; (2) that the defendant used the trademark in commerce and without consent; and (3) that there was a

likelihood of consumer confusion. *1-800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400, 406 (2d Cir. 2005); 15 U.S.C. § 1114(1).*

Plaintiff further alleges a violation of Section 1(b) inasmuch as Defendants allegedly contracted for the manufacture of the goods in question. Email correspondence demonstrates by a strong preponderance of the evidence that the Defendants ordered Altec Lansing® product knowing full well that neither they nor their distributor or manufacturer were authorized to do so.

1.    Ownership of the Altec Lansing Trademarks

Defendants have not rebutted this presumption. Accordingly, this Court may conclude that AL Infinity owns the Altec Lansing trademarks, and that any unsanctioned use by Defendants would amount to an infringement.

2.    Use of the Altec Lansing Trademarks

To satisfy the second element, a plaintiff must establish that "the defendant used the mark, . . . in commerce, . . . 'in connection with the sale . . . or advertising of goods or services' without the plaintiff's consent." *1- 800 Contacts, Inc., 414 F.3d at 406 (quoting 15 U.S.C. § 1114(1)).* "[I]t is well settled that a retailer's direct sale of an infringing product is sufficient to create liability." *GMA Accessories, Inc. v. BOP, LLC, 765 F. Supp. 2d 457, 463 (S.D.N.Y. 2011) (citing El Greco Leather Prods. v. Shoe World, 806 F.2d 392, 396 (2d Cir. 1986)); see also Vuitton et Fils, S.A. v. Crown Handbags, 492 F. Supp. 1071, 1076 (S.D.N.Y. 1979) aff'd, 622 F.2d*

22

*577 (2d Cir. 1980)* (finding trademark infringement where defendant "offer[ed] for sale a combination of product and trademark which exactly mimics that of plaintiff, resulting in the type of confusion and deception which the Lanham Act was designed to prevent"). Defendants do not contest that they offered two different Altec Lansing-branded products on the Walmart.com website and on Amazon during the relevant period. (A33, A59) As such, Defendants' use of the Internet to promote Altec Lansing-branded products plainly brings this claim within the scope of the Lanham Act.

Noteworthy is that according to the Lanham Act, the Defendants do not need to produce or manufacture the counterfeit mark to actually be engaged in counterfeiting. The Act denies Defendants the use of the subject trademark for distribution or sale of goods or services. *15 U.S.C. 1114(1)(a) and 15 U.S.C. 1117(b).*

The Lanham Act is a strict liability statute, a registrant need not prove knowledge or intent in order to establish liability. *Procter & Gamble Co. v. Quality King Distrib., Inc., 123 F. Supp. 2d 108, 113 (E.D.N.Y. 2000); see also Sunward Elec., Inc. v. McDonald, 362 F.3d 17, 25 (2d Cir. 2004); El Greco Leather Products Co. v. Shoe World, Inc., 806 F.2d 392, 396 (2d Cir. 1986)* (defendants' "claimed lack of knowledge of its supplier's infringement, even if true, provides no defense"). "[W]rongful intent is not a prerequisite to an action

23

for trademark infringement [under the Lanham Act] . . . , and [ ] good faith is no defense." *Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 25 (2d Cir. 2004)* (internal quotation marks omitted). Rather, "a retailer's direct sale of an infringing product is sufficient to create liability." *GMA Accessories, Inc. v. BOP, LLC, 765 F. Supp. 2d 457, 463 (S.D.N.Y. 2011), aff'd sub nom. GMA Accessories, Inc. v. Elec. Wonderland, Inc., 558 F. App'x 116 (2d Cir. 2014); see also El Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d 392, 396 (2d Cir. 1986)* ("Even though [defendant] was involved neither in the manufacture nor the affixing of the [plaintiff's] trademark to the shoes, its sale of the shoes was sufficient 'use' for it to be liable for the results of such infringement. . . ."). "Strict liability under the Lanham Act does not turn on whether a defendant physically possessed the goods . . . [and] liability may be premised on the 'the sale, offering for sale, distribution, or advertising of any goods or services.'" *Abbott Labs. v. Adelphia Supply USA, No. 15-CV-5826 (CBA) (LB), 2019 WL 5696148, at *7 (E.D.N.Y. Sept. 30, 2019)* (quoting 15 U.S.C. § 1114(1)(a)).

    3.    Likelihood of Consumer Confusion

Typically, the question of consumer confusion is governed by reference to the non-exclusive list of factors identified by the Second Circuit in *Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961)*. However, the *Polaroid* factors "are more geared towards comparing two distinct, albeit

similar, marks." *Ryan* v. Volpone Stamp Co., Inc., 107 F. Supp. 2d 369, 400 (S.D.N.Y. 2000). By contrast, application of the factors is "unnecessary" where use of an identical mark – that is, a counterfeit mark – is at issue. *L&L Wings, Inc. v. Marco-Destin, Inc., 676 F. Supp. 2d 179, 189 n.2 (S.D.N.Y. 2009); see 15 U.S.C. § 1127* (defining "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark"). Given that a counterfeit mark is "inherently confusing," consumer confusion is presumed in such cases. *Coach, Inc. v. Allen, No. 11 Civ. 3590 (CM), 2012 WL 2952890, at \*7 (S.D.N.Y. July 19, 2012).* Defendants has made use of the Altec Lansing trademark to sell its products without the consent of the actual trademark holder. Defendants' actions thus constitute use of a counterfeit mark, and consumer confusion is presumed. (Even if the Court were to consider the *Polaroid* factors, AL Infinity would succeed in establishing consumer confusion based on the celebrity of the trademarks, as well as Defendants' deliberate use of identical marks to sell presumably identical goods. *See Polaroid Corp., 287 F.2d at 495* (listing the factors))

Similarly, "[w]hen an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law." *L&L Wings, Inc., 676 F. Supp. 2d at 188 citing Ryan v. Volpone Stamp. Co., 107 F. Supp. 2d 369, 399 (S.D.N.Y. 2000)); accord C=Holdings B.V. v. Asiarim Corporation, No. 12 Civ. 928*

(RJS), — F. Supp. 2d —, 2013 WL 6987165, at *10 (S.D.N.Y. Dec. 16, 2013); *see also Bowmar Instrument Corp. v. Continental Microsystems, Inc., 497 F. Supp. 947, 959 (S.D.N.Y. 1980)* (holding that continued use of a mark after termination of a license constitutes trademark infringement). This is because, "[i]n such situations, confusion is almost inevitable [as] consumers have already associated the formerly licensed infringer with the trademark owner." *Id.* Put another way, "[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 205 (2nd Cir. 1979).* "In such situations, confusion is almost inevitable because consumers have already associated the formerly licensed infringer with the trademark owner." *Microban Prods. Co. v. Api Indus., Inc., 14 Civ. 41 (KPF) (S.D. N.Y. May 08, 2014), citing L & L Wings, 676 F. Supp. 2d at 188 (citing Ryan, 107 F. Supp. 2d at 399).*

Accordingly, because Defendants used counterfeit marks and continued to use the marks after its <u>supplier's</u> <u>supplier's</u> <u>affiliate's</u> <u>alleged</u> relationship with AL Infinity's predecessor long ended, the Court should conclude that AL Infinity has established consumer confusion as a result of Defendants' infringing use.

Having demonstrated that AL Infinity owns the Altec Lansing trademarks, that Defendants used those marks in commerce and without AL Infinity's consent, and that Defendants' use resulted in consumer confusion, Defendants have infringed

AL Infinity's trademarks when it advertised Altec Lansing-branded products on the Walmart.com website and Amazon and sold product to ultimate consumers.

B. False Advertising and Unfair Competition Under Section 43(a)(1)(B) of the Lanham Act

AL Infinity asserts that Defendants engaged in false advertising and unfair competition in violation of section 43(a)(1)(B) of the Lanham Act when it promoted and sold Altec Lansing- branded products on the Walmart.com website and on Amazon.

A person is liable under section 43(a)(1)(B) if "in connection with any goods or services . . . [he] uses in commerce any . . . false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." *15 U.S.C. § 1125(a)(1)(B)*. A section 43(a)(1)(B) claim requires (1) a false or misleading statement (2) in connection with commercial advertising or promotion that (3) was material, (4) was made in interstate commerce, and (5) damaged or will likely damage the plaintiff.

It is well established that the promotion of counterfeit goods on the Internet may give rise to false advertising liability under the Lanham Act. *See*, *e.g.*, *Tiffany (NJ) Inc.*, *600 F.3d at 113–14*.

By promoting Altec Lansing-branded products on the Walmart.com website and on Amazon, Defendants violated section 43(a)(1)(B). First, though not expressed in as many words, the *unambiguous* message sent by this promotion was that Defendants offered for sale authentic Altec Lansing products. Accordingly, the Defendants' promotion of Altec Lansing-branded products on the Walmart.com website was literally false, and as such, consumer deception is presumed. Second, it is indisputable that this activity by the Defendants constituted "commercial advertising or promotion." Third, Defendants' falsehood was material, going to the very nature of the products Defendants purported to sell. *See*, *e.g.*, *Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano, No. 03 Civ. 0015 (RWS), 2005 WL 1595285, at *7–8 (S.D.N.Y. July 6, 2005)* (finding that defendant's unlicensed use of trademark to label product was a material falsehood for purpose of false advertising claim). Fourth, Defendants placed that material falsehood into interstate commerce by publishing its advertisement on the Internet – an obvious "campaign to penetrate the relevant market." Finally, Defendants' falsehood damaged AL Infinity because it allowed for non quality controlled product to reach the market, in a distribution channel that was not approved by the brand owner and with admitted outdated packaging, instructions and warranties. The product itself hadn't been in Plaintiff's line. (A324, ¶58) Defendants' conduct further cast doubt on AL Infinity's ownership of the Altec Lansing brand. Accordingly, the Court should have granted

summary judgment in favor of AL Infinity on its false advertising claim with respect to Defendants' advertisement of Altec Lansing-branded products on the Walmart.com website.

C. Injury to Reputation and New York State Anti-Dilution In Violation Of New York State General Business Law Section 360-l

Defendants' conduct further violates the New York dilution statute, N.Y. Gen. B. L. § 360-l (1996). The New York statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a grounds for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

*N.Y. Gen. Bus. L.§ 360- l.* An analysis of New York dilution requires consideration of (i) the distinctive nature of the senior mark and (ii) whether blurring is likely to occur. *See e.g., GTFM, Inc. v. Solid Clothing, Inc., 215 F.Supp.2d 273, 301 (S.D.N.Y. 2002)* (finding dilution likely under New York statute where marks "are highly similar, as are the products to which their respective designations are affixed"); *Nike Inc. v. Top Brand Co. Ltd., No. 00 Civ. 8179 (KMW)(RLE), 2005 WL 1654859, at *9 (S.D.N.Y. Jul. 13, 2005)* (granting summary judgment to plaintiffs on New York state dilution claim).

Significantly, "[u]nlike federal trademark dilution law, however, New York's trademark dilution law does not require a mark to be 'famous' for protection against

dilution to apply." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 114 (2d Cir. 2009)*. "Nor are the factors that are considered for determining dilution by blurring under New York law coextensive with the factors for determining dilution by blurring under federal law." *Id.*

Blurring occurs "where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 43 (2d Cir. 1994). "Blurring is 'the whittling away of the established trademark's selling power and value through its unauthorized use by others.'" *Bath and Body Works Brand Mgmt., Inc. v. Summit Enter., LLC,* 7 F.Supp.3d 385, 399 (S.D.N.Y. 2014). "To determine the likelihood of blurring, we have looked to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *New York Stock Exchange, Inc. v. New York, New York Hotel LLC,* 293 F.3d 550, 558 (2d Cir. 2002). These factors have been discussed at length herein. In short, Defendants' use of name that is identical to the distinctive Altec Lansing® mark compromises Plaintiff's brand and blurs the mark's unique identification of Plaintiff's products.

**IV.    The District Court erred in denying Plaintiff summary judgment and in granting summary judgment against the Plaintiff; the issues of counterfeiting and trademark infringement should have been resolved in favor of Plaintiff as a matter of law or, at minimum, given to a jury to find**

A. The court below did not give enough weight to Plaintiff's Evidence

1.    Isaac Franco's Testimony was sufficient to at least shift the burden to Defendants

Appellant indisputably established ownership of the trademark and evidence of the sale of AL Infringing Product and the lack of a license to do so. Appellant presented a Declaration of Mr. Isaac Franco with a history of the brand and his company's ownership thereof and the lack of any license on the part of Crown Cell to import and/or sell "Altec Lansing®" product. Appellant also presented portions of the deposition transcript of defendant Isser Boyarsky.

Having done so, the burden of proof should have shifted the defendants to prove they (or an entity upstream) had a license to sell Altec Lansing® product, and to order its manufacture. The scant (at best) showing of stale, unauthenticated, unsigned and incomplete agreements between alleged predecessors-in-interest and alleged "affiliates" of Defendants' manufacturer in China should not have been deemed sufficient evidence to prove that. These were red-herring documents that were not only irrelevant (aside from being a decade old, and in 2 cases incomplete,

31

they did not even involve the factory at issue!), but simply inadmissible; in fact, they were introduced as an Exhibit to counsel's Affidavit, not a party or non-party witness.

The Defendants <u>should not</u> have been allowed to plead ignorance about the manufacture of their product once the plaintiff's *prima facie* case raised sufficient and significant issues about the authenticity of their product.  Mr. Franco made his showing that these goods were being sold without a license, that he never gave or ratified any consent to any third party to make these two items, and that the goods were outdated (meaning that to be plausible, a fact-finder would have to find that product had been sitting on a factory shelf, undeteriorated, for years; the court below should have instead afforded Plaintiff all inferences in its favor).  Once the plaintiff made its *prima facie* case, the court below should have required the <u>defendants</u> to prove their right to manufacture and/or sell.  There is no dispute that the import records relevant to the infringing goods date to 2016 or 2017.  There was no evidence presented to demonstrate that the goods were manufactured by a factory that was licensed to produce the goods <u>at the time of manufacture</u>.  At minimum, the court below should have allowed those issues to proceed to trial for a fair resolution by a fact finder.

Crown Cell's prior history with Westview or misplaced trust in Westview's being "a reputable firm" should have been of no consequence.  (A368; this was

given weight by the District Court, A449, A464)  Again, the District Court tipped an inference in the moving party's favor, not the other way around.

The court below made note of an early-dated copyright notice on the product (A449), but that is simply not pertinent.  A copyright notice dates back the creation of a design, indicating that the item in question was not manufactured before the said date; it says nothing about how long <u>after</u> the said date the product was manufactured.

The District Court improperly opined that a deposition of Shenzhen Fenda in China – which is difficult, if not illegal[2] to take – was "central" to Plaintiff's case. The court made clear its opinion (A442, A458, A479), that "no effort was made to obtain discovery from Fenda."  This was an unfair demand.  The Plaintiff presented sufficient evidence of infringement without it.  The Defendants, not the Plaintiff, should have been taken to task for not bringing testimony from Shenzhen Fenda to support is fanciful theory (and to support the alleged "Fenda" documents which Defendant introduced).

On August 9, 2023, the Court issued a Memorandum and Order (the "Order") denying plaintiff's motion and granting defendants' motion because plaintiff "failed to present evidence that the goods were in fact counterfeit" (A453, A462) and defendants "presented affirmative evidence" demonstrating that the

_____

[2] See FN 7, infra.

speakers in question were supplied and distributed by entities that, "at least at one point," were "authorized to make or sell Altec Lansing products." (A453, A462, A475)  The District Court further found that because plaintiff did not provide any evidence that such authorization was ever withdrawn, plaintiff did not meet its burden of showing that the goods sold were not genuine. (A466-A468, A475)  This misstates the burden of proof in this matter and disregards the issues of fact that should have at least gone to a jury (if not resolved in Plaintiff's favor).

That Plaintiff was unable to secure Fenda's appearance, testimony or documents is of no import.  Plaintiff presented a sound *prima facie* case using Isaac Franco, a principal of the trademark owner, and two depositions of the defendants during which the smoking gun Shenzhen Fenda emails were discussed and the serious suggestions of manufacture, "production," parts and "lead time" raised.  This is all not to mention, as will be discussed below, that the defendants had no evidence or firsthand testimony demonstrating a right to trade in plaintiff's brand name other than three incomplete, irrelevant and admittedly old documents it passed off as binding license agreements.

That lack of evidence on Defendants' part alone should have warranted summary judgment in plaintiff's favor.  At minimum, the District Court should have allowed a jury to evaluate these issues of fact instead of deciding them as a matter of law.

As for counterfeiting, the Court below improperly stated that "Plaintiff never purchased or inspected the speakers at issue to evaluate if they differed in any way from authentic goods." And that "[t]his litigation failure deprives the Court of the most effective tool it has to determine whether a plaintiff has met its burden at summary judgment, namely a side-by-side comparison revealing whether there are slight deviations between the goods at issue and the authentic goods." (A456-A457).  The Court later reiterated that "… plaintiff never inspected the disputed goods to determine if there were any differences between the genuine speakers and the disputed ones" (A471).  First, Isaac Franco testified that the item in question had never been in any of his company's Altec Lansing® product lines and, if it ever was in a former owner's line in the past, it had not been in years. (A324)  Second, even if identical Altec Lansing® product was manufactured by Shenzhen Fenda after the expiration of any license to do so (although neither the identity of the product formerly allowed nor the permission by Shenzhen Fenda has been proven by Defendants), Appellant contends it would constitute a counterfeit.  That was the holding in a recent District of Indiana default judgment case, Century 21 v. Destiny Real Estate, where the court explained:

> If an unrelated entity had created an identical trademark and provided authorized goods or services (or the kind provided by the owner of the mark) under that mark, there would be no question that there was counterfeiting. The Court can conceive of no reason why an ex-franchisee should escape liability for counterfeiting simply because that person had access to a

35

franchisor's original marks because of the former relationship and therefore did not need to reproduce an identical or substantially similar mark.

*Century 21 Real Estate LLC v. Destiny Real Estate Properties LLC et al, No.*

*4:2011cv00038 - Document 17 (N.D. Ind. 2011).*[3]  In *General Elec. Co. v.*

*Speicher, 877 F.2d 531 (7th Cir. 1989),* the court held that counterfeiting is not

limited to reproduced (literally "counterfeit") marks and includes the use of a

genuine mark on an unauthorized product.

In the criminal context, the statutory definition of "counterfeiting" explicitly

excludes "overrun" goods, which are marks "used in connection with goods or

services of which the manufacturer or producer was, at the time of the manufacture

or production in question authorized to use the mark or designation for the type of

goods or services so manufactured or produced, by the holder of the right to use

such mark or designation." 18 U.S.C. § 2320(d) (emphasis added).  An example of

this so-called "overrun exemption" would be in a case in which a manufacturer is

licensed by a trademark owner to produce 500,000 umbrellas using the trademark

owners mark and the trademark licensee produces an additional 500,000 umbrellas

using that mark without authorization. *See Joint Statement on Trademarking*

---

[3] Other courts have come to differing conclusions on this issues, in various contexts. In a 1997 case, U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185 (6th Cir. 1997), the 6th Circuit held that a franchisee's holdover use of a trademark was not counterfeiting. The 9th Circuit held that the licensee's holdover was counterfeiting in a 2005 case involving continuing use of the Idaho potato certification mark. *State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc., 425 F.3d 708 (9th Cir. 2005).*

*Counterfeiting Legislation, 130 Cong. Rec. H12076, H12079 (daily ed. Oct. 10, 1984)*. Congress intended that the burden be on the defendant to prove that the goods or services in question fall within the overrun exemption. *Id.* While not applicable in this civil case, this definition is instructive inasmuch as the manufacturer needs to have the right to manufacture at the time of manufacture and inasmuch as the defendant, not the plaintiff, has the burden of proving an overrun.

> 2. The Court below also did not give enough weight to Isser Boyarsky's own statements and/or suggested that emails constituted inadmissible hearsay

>> a. Emails were corroborated by the testimony of Isser Boyarsky; at minimum the court below failed to distinguish between emails among Isser Boyarsky, who testified at his depositions as to the email content, and emails between Mr. Steinberg and his factory, Fenda.

The record includes an invoice showing the purchase by Defendant Crown Cell of 1,378 units of Altec Lansing Computer Speakers, Model No. VS4621, in early 2016. (A66-A67, A133-A125) Email correspondence from around that time, corroborated by the deposition testimony of Defendant Isser Boyarsky, suggests that the goods were not in stock, but were being manufactured at the time. The words "minimum builds" appear in an email to defendant Boyarsky. (A86-A88, A353, A137-A138, A149)

Emails – corroborated by Boyarky – also suggest that work in process needed "completion." (A140, A160, A379, A387, A391, A355, A371-A372) The first set of emails contains communications between Boyarsky at Crown Cell and

Steinberg at Westview, in which there are references to an approximately one-month "lead time," as well as "factory production times" for the speakers. (A148, A157-A158, A364, A383-A385, A389, A391, A393)

On these, the Court below opined, with no support, that "If anything, the fact that the lead times are relatively short (about 30 days) weighs against plaintiff's presumption that the products were entirely produced when ordered" and that "These references to "production" are insufficient as there is no other evidence describing what was actually done to produce the goods."  Again, the Court was acting as fact-finder instead of leaving it to a jury to decide what these unambiguous terms mean in this context.  The Court's personal opinion about production lead times and the meaning of "production" in an email are, respectfully, irrelevant given that both provide at least material issue of fact, if not smoking guns in themselves.

Isser Boyarsky, in commenting on these emails, testified at his deposition: "In the e-mails that you have sent, you can see Mr. Steinberg sent certain e-mails saying he is concerned with the factory, specific quantities. I believe he was confirming it, and he was waiting for us to issue a purchase order.  Once we issued a purchase order, he made his purchase order, and the deal was transacted that way. He purchased it directly for us." (A55)  He recalled receiving a March 18, 2016 email (A70) and confirmed that "[i]t [was] an offer from Allen stating what units

are available and the price points. *Id.* As stated above, Boyarsky testified that he "pictured that [the manufacturer] had the products sitting on shelves. All the parts were there. Everything was there. It just had to be packaged." (A71-A72) By his own statement, this is not proven or factual in any way, just something "he pictured" based on the 5-week lead time which he – without explanation – felt was relatively short. (A71) Plaintiff, on the other hand contended that the 5-week lead time was exactly the smoking gun the District Court should have considered. He understood that minimum quantities had to be ordered (A351) and that the factory had to cost out the "small speaker." *(Id.)*

The court below gave no weight to these suspect elements of Mr. Boyarsky's emails, all of which he ratified at his deposition. Again, no favorable inference was given the non-moving party.

The record shows clearly Mr. Boyarsky's belief that the product he was offering needed at least some processing – be it assembly (hence, a counterfeit) or packaging (Appellant contends a counterfeit, as well) and "completion." The court below afforded no weight to this admitted belief by Mr. Boyarsky. (A355-A356)

The Court below did properly note that "The first set of emails between Boyarsky at Crown Cell and Steinberg at Westview simply references the approximately one-month "lead times" and "factory production times" (A450, A458) for the speakers but essentially made unsupported findings when it (not a

39

jury) ruled that "[t]hese references to "production" are insufficient as there is no other evidence describing what was actually done to produce the goods. (A458) As of the word "production" is insufficient to sound a counterfeiting alarm. The Court instead opined that "[i]f anything, the fact that the lead times are relatively short (about 30 days) weighs against plaintiff's presumption that the products were entirely produced when ordered." (A459) First, these are issues for a jury to determine and second, the Court improperly stated that there was no other supporting evidence, disregarding Plaintiff's *prima facie* showing by Isaac Franco, that neither Westview nor Crown Cell had a current license to manufacture, import or sell Altec Lansing® branded product and that the product in question had not been in an Altec Lansing® product line for years.

A second set of emails are between Allan Steinberg of Westview and employees at Shenzhen Fenda. The Court "doubted" the admissibility of these emails, but noted that they contained similar statements regarding "lead times," the "completion of goods," and Shenzhen Fenda's ability to "produce goods." (A450, A459). The emails make specific mention that Shenzhen Fenda needed to "reorder materials" and "produce the goods [with] almost 90% [] new materials." (A389) In evaluating this, the Court again stated that "the record contains no detail as to what Shenzhen Fenda actually did to 'produce' the goods…" (A460) failing to give

weight to the word "produce" itself and the fraught, material issue of fact that that word alone creates.

The District Court noted that "It is unclear from the record exactly what Shenzhen Fenda did in order to supply the speakers to Westview." (A449) This may be true. However, the Court kept the burden on the plaintiff, not the defendants, to present "detail as to what Shenzhen Fenda actually did to 'produce' the goods," as if the word "produce" – used multiple times – was insufficient to at least raise an issue of fact as to what happened in China. Instead of allowing a jury to fill in the said gap, the Court unfairly asserted <u>its</u> opinion that "Plaintiff cannot fail to investigate and then rely on ambiguity to prove its case." (A460) The Plaintiff had made a sufficient *prima facie* case (and no one disputed it – all parties agree that the plaintiff owns the marks in question, that the defendants sold the product in question, and that defendants had no license to do so). The plaintiff brought evidence of "production." It should therefore have been the <u>Defendants</u>, not the Plaintiff, who "cannot fail to investigate and then rely on ambiguity to prove its case."

Along the same lines, the Court below stated that "even if Fenda did entirely manufacture the speakers in 2016 and 2017, plaintiff does not provide any evidence that Fenda was not permitted to do so." (A461) Again, this misplaces the burden of proof on the Plaintiff. Once it established its *prima facie* case or

41

trademark ownership, sale and no license to sell, the Defendants must prove a right or permission to do so. It also removes from a jury the ability and right to make these fact-based determinations.

### b. Emails fell into a hearsay exception

Defendants argued, and the Court made suggestions, that the statements of the Shenzhen Fenda employees constituted hearsay and were therefore inadmissible. The District Court held that the said emails did not fall into any hearsay exception. Appellant maintains that (a) the testimony of Isser Boyarsky overshadows and obviates the issue of admissibility, (b) even if they were hearsay, the Court should still have allowed them to serve to defeat summary judgment (see, infra, Section IV(D)) and (c) in any case, the emails should have been deemed admissible as: (1) business records or (2) statements against interest.

### i. Business Record Exception

Among the exceptions to hearsay is Fed. Rule Evid. Rule 803(6) which permits "records of regularly conducted activity." Rule 803(6) is based on the traditional "business records" exception. This exception is premised on the notion that business records are reliable due to "systematic checking, by regularity and continuity which produce habits of precision, by actual experience in relying upon, or by a duty to make an accurate record as part of a continuing job or occupation." *Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, 4 Federal Rules of*

*Evidence Manual, § 803.02[7] (11th ed. 2015) (quoting Advisory Committee Note to Paragraph (6) of 1972 proposed rules).* By its terms, Rule 803(6) extends beyond records of businesses. It applies to all records made as part of any "regularly conducted activity," whether by a "business, organization, occupation, or calling, whether or not for profit." Fed. R. Evid. 803(6)(B).

While it is true that historically (we assert things are quickly evolving in this area) "An e-mail created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule," *(Morisseau v. DLA Piper, 532 F. Supp. 2d 595, 621 n.163 (S.D.N.Y. 2008) (citing FED.R.EVID. 803(6))* courts will apply a similar approach to emails as they do to any other business memoranda. *See Penberg v. HealthBridge Mgmt., 823 F. Supp. 2d 166, 187 (E.D.N.Y. 2011)* (concluding that "[c]ourts have applied a similar approach to emails" as to "conventional letters, memos, or notes") (internal quotation marks and citations omitted); *United States v. Stein, No. S1 05 Crim. 0888 (LAK), 2007 WL 3009650, at *1 (S.D.N.Y. Oct. 15, 2007)* (concluding that "it is impossible to determine in the abstract which of the documents defendants have in mind satisfy the Rule and which do not").

Therefore, emails must satisfy each element of the Rule 803(6) test. To be admissible, an email must have been written "at or near the time" of the occurrence of the facts described in the email. Rule 803(6) further requires both that the

activity recorded in the email be a "regularly conducted" business activity, and that sending the email be a regular part of that activity. *Id.* "[I]t is not enough to say that as a general business matter, most companies receive and send emails as part of their business model," *In re Oil Spill, No. MDL2179, 2012 WL85447, at *3 (E.D. La. Jan. 11, 2012);* the email record must be "regularly made in furtherance of the employer's needs." *Penberg, 623 F. Supp. 2d at 187.* The party offering the document into evidence must provide a custodial witness to prove "all" of the conditions required by Rule 803(6). Allen Steinberg stated in his Affidavit that the emails were authentic and, in his "Cooperation Agreement," that all records he had turned over to Infinity after having received a cease and desist demand were records maintained in the ordinary course of his business.

Finally, the party objecting to admission of the documents may show that despite satisfaction of the other elements, the emails "indicate a lack of trustworthiness," *Fed R. Evid. Rule 803(6)*, which the Defendants have not done.

On the first element, the emails are contemporaneous with the events described therein; there should be no issue there. The email correspondence itself would indicate that the second and third elements, too, are met here. Clearly, all of Westview's negotiation, purchasing and production is done by email and it is clearly their practice (as it is any other business in the industry) to preserve these discussions, correspondence, negotiations and purchases on their servers. Again,

the Settlement Agreement presented by the Defendants in their moving papers says so.

On Page 3 of a Cooperation and Settlement Agreement between Plaintiff and Westview (A266, provided by Defendants as Exhibit 14 to their motion), Westview writes: "Westview represents that all documents that Westview has supplied to [Plaintiff] Infinity or its counsel were created and maintained by Westview in the ordinary course of its business and constitute its business records, and that such documents were obtained from Westview's files and computers after searching for any records responsive to Infinity's prior requests, as set forth in Exhibit A hereto and in emails prior thereto." (A266)  Isaac Franco confirmed that the emails in question were the very emails given to Infinity by Westview[4], i.e. during or after his settlement with Westview or from the Defendants, making them business records in accordance with Westview's designation in the Cooperation and Settlement Agreement. (A316)  In any event, Plaintiff made clear in its opposition papers that it had sought a Supplemental Declaration of Allen Steinberg

---

[4] "Email correspondence between Westview (Crown Cell's supplier) and Shenzhen Fenda from March 2017 obtained during discovery corroborate all of the foregoing (including what appears in the emails between Defendants and Westview), beginning with a discussion of when "production can be completed…" A324, ¶59.

to put the issue to bed, but counsel for Mr. Steinberg had been overseas and that, were the court to require one, it would be obtained.[5]

On the fourth element, Mr. Steinberg is perfectly qualified as a principal of his company with knowledge, to testify as to the documents provided and their designation as business records (he authored the Declaration authenticating the emails and he signed the Cooperation and Settlement Agreement referenced below).

As for the fifth element, 803(6)(E), the Defendants have not shown a lack of trustworthiness of the emails.

The District Court did acknowledge that "[w]hile '[a]n email could conceivably qualify as a business record if, for example, it confirms a sale,' when the emails, as is the case here, "contain unique and sporadic communications, not created as a record of any 'regularly conducted business activity,'" they are not admissible under Rule 803(6). *A459, citing New World Trading Co. Ltd. v. 2 Feet Productions, Inc., Nos. 11-cv-6219, 13-cv-1251, 2014 WL 988475, at \*1 (S.D.N.Y. Mar. 13, 2014).* Again, the Court, not a jury, decided that the emails reflected sporadic communications, not regular business activity.

---

[5] Plaintiff stated, in its opposition, that "should the Court require a Supplemental Declaration on the issue, Plaintiff respectfully seeks an additional week during which to attempt to obtain the same." The Court did not comment on this in its decision.

ii. Statement Against Interest

Where a Declarant is unavailable, as is Fenda in this case, FRE 804 provides

another hearsay exception applicable here. The Rule provides:

(b) The Exceptions. The following are not excluded by the rule against

hearsay if the declarant is unavailable as a witness:

…

(3) Statement Against Interest. A statement that:
(A) a reasonable person in the declarant's position would have made only if
the person believed it to be true because, when made, it was so contrary to
the declarant's proprietary or pecuniary interest or had so great a tendency to
invalidate the declarant's claim against someone else or to expose the
declarant to civil or criminal liability;
…

*Fed. R. Evid. Rule 804.*

In this case, at the time the <u>smoking gun Fenda emails</u> were being written

and responded to by Fenda and Westview. Both undoubtedly knew that Westview

had no license, which could subject both Westview and Fenda to liability.

Defendants' own Rule 56.1 Statement (A288, ¶¶ 14-18) describes Fenda's waning

involvement with the Altec Lansing® brand back in 2012 and the limits of its sell-

off of Altec parts back in 2012, acknowledging that a new "production" – which

the <u>smoking gun Fenda emails</u> demonstrate was taking place – would be improper

if not illegal.

Thus, and in the alternative, the emails qualify under this exception.

47

B. The Court below gave too much weight to unauthenticated, incomplete, stale and outdated agreements with non-parties to this case (an alleged "affiliate" of Defendant's factory, not the factory itself)

1. The Agreements Weren't Agreements At All. They Were Incomplete, Outdated and Involved Non-Parties

2. There is No Evidence on the Record Indicating that "ShenZhen Baon Fenda Industrial Co., Ltd." was an Affiliate of Defendants' Manufacturer, Shenzhen Fenda Technology Co., Ltd.

The Defendants alleged – and the Court below accepted – that Westview served as a manufacturer's representative of the prior owners of the Altec Lansing® trademarks, including Altec Lansing Technologies, Inc. This, and all of the related allegations concerning prior agreements, is only supported on the record by an attorney declaration. (A91, ¶16; A100, et seq.) Defendants alleged that on January 1, 2003, over a decade before any of the events in question, Westview entered into a "Sales Representative Agreement" with Plantronics, Inc., a previous owner of the Altec Lansing® trademarks, pursuant to which Westview was allegedly appointed to solicit orders for products bearing the Altec Lansing® trademarks. That Agreement is wholly irrelevant. It also appears nowhere on the record! It is only mentioned in a one-page December 1, 2009 "Amendment to Sales Representative Agreement," (A100) introduced and authenticated by an attorney Declaration (A17).

2009, too, is years before any alleged production of the product in question. It's also not fully signed! In any case, it involves Plantronics, Inc., an alleged predecessor-in-interest to Plaintiff with respect to the Altec Lansing® trademarks (2 steps removed) and it states that, e.g., "[Westview] shall no longer be appointed to solicit orders for the Altec Lansing® Products." In other words, whether or not properly authenticated, the "Amendment" served to terminate any alleged right of Westview to solicit Altec Lansing® product orders after 2009.

Second, the Defendants alleged that on October 18, 2004, again over a decade before any of the events in question, Altec Lansing Technologies, Inc. (another predecessor-in-interest with respect to the Altec Lansing® trademarks), entered into a "Memorandum of Understanding" (A102-A104) with ShenZhen Baon Fenda Industrial Co., Ltd., which Defendants allege (but do not prove) was an affiliate of Westview's source, Shenzhen Fenda Technology Co., Ltd. That "Memorandum" should have been afforded no weight because it was not authenticated by a party and because nothing on the record demonstrates that ShenZhen Baon Fenda Industrial Co. has anything to do with Shenzhen Fenda Technology Co., Ltd., the manufacturer of the AL Infringing Product.

In any case, the "Memorandum" states that, e.g., "both parties wish to enter into a customer/supplier arrangement," "Altec is interested in the technology and new product concepts developed by supplier and/or partners," and "[Fenda] agrees

to offer Altec new product designs and developments within the range of [Fenda's] capabilities." This is not clearly a binding agreement, has terms which are unspecific, vague and not defined and mentions no specific product. Moreover, nothing on the record demonstrates that this 2004 Memorandum was assignable (and, in fact, assigned) or in effect nearly a decade later.[6]

Finally, the Defendants alleged that on February 16, 2009, Plantronics, Inc. entered into a Vendor Managed Inventory Addendum ("VMIA") (A106) – also never authenticated – again with a non-party to this case, ShenZhen Baoan Fenda Industrial Co., Ltd. The document states, e.g., that "[Fenda] agrees to supply the Goods specified in Exhibit A (as may be updated from time to time by mutual agreement of the parties) to Altec." Again, pursuant to the "Amendment to Sales Representative Agreement," Westview had no right to offer any Altec Lansing® product after December 2009. In any event, this February 2009 VMIA, by its alleged terms, "amends the Plantronics Order Terms and Conditions … by and between Altec Lansing … and Seller [ShenZhen Baon Fenda Industrial Co., Ltd.]." The underlying "Plantronics Order Terms and Conditions" was never produced by the Defendants, making this VMIA not only unauthenticated, but an incomplete document – either way inadmissible. Moreover, the products to which this document

---

[6] Recall that according to the 2009 "Amendment to Sales Representative Agreement," Westview agreed that had no right to offer any Altec Lansing® product after December 2009, rendering the sale in the case at bar problematic according to Defendants' own evidence.

applies are not specified. The document makes reference to an "Exhibit A" which, in turn, references an "Altec Lansing Product List," but it was never presented by the Defendants.

Key to the Court's conclusion, and to its error, is the Court's finding that that defendants "presented affirmative evidence that plaintiff's predecessors had agreements with both Fenda and Westview, revealing that, at least at one point, Fenda and Westview were authorized to make or sell Altec Lansing products." And that "the Court found no evidence suggesting that these arrangements were ever terminated." (A462)

The Court below reasoned that "the record contains several agreements between plaintiff's predecessors and a Fenda affiliate authorizing Fenda to supply certain Altec Lansing goods." (A477) And that "at least one of plaintiff's predecessors also had a relationship with Westview to distribute Altec Lansing goods." (A448, A447)

These statements are simply wrong. There was never any such "affirmative evidence"; there were no <u>complete</u> agreements on the record with Westview, the other 2 documents were not with Fenda, and none of the three were authenticated; they should have been given no probative weight; certainly not as a matter of law.

Even of the said documents were persuasive, the Court erred in requiring the plaintiff, not the defendants, to "articulate why its predecessors' agreements with

Fenda's affiliates are not persuasive evidence that Fenda was an authorized manufacturer." (A487)

Again, at worst, the issue of whether these stale, incomplete and unauthenticated old agreements were still in effect should have gone through a proper fact-finding trial. At best, Defendants should have been taken to task to prove the existence of (a) a valid right to manufacture on Fenda's part and (b) a valid license to import and sell on its part before importing and distributing branded merchandise for a profit.

3. The "Agreements" are simply inapplicable to Crown Cell's (and Westview's) sale without a license and, hence, infringement

Even were this Court to entertain the flawed "evidence" relied upon by the District Court, nothing in them demonstrates or even suggests that either Westview or Crown Cell had a license to trade in Altec Lansing® product, legitimate or not. Thus, in no event should the District Court have dismissed the non-counterfeiting causes of action.

C. The District Court Also Gave Too Much Weight to Copyright Notices

Samples in Crown Cell's inventory allegedly show that the AL Infringing Products included the following copyright notices "©2012 Altec Lansing, LLC," "©2010 Altec Lansing, LLC," and "©2008-2010 Altec Lansing, LLC". (A212-A214, A79-A81, A34-A35) The District Court gave weight to this (A449, ,

52

notwithstanding that copyright notices merely date a copyright creation and evidence only that the product at issue was not manufactured <u>before</u> 2008; <u>not</u> that the product <u>was</u> manufactured before 2014. In other words, this is a fact completely irrelevant to dating the manufacture of the product in question in this case and yet, was afforded weight by the District Court.

D. The District Court erred in demanding strictly admissible evidence to defeat Defendants' Motion for Summary Judgment

In ruling on a motion for summary judgment, the district court may rely on "any material that would be admissible" at a trial. *Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) (internal quotation marks omitted); see, e.g., Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997); Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994); 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil § 2721 at 361 (3d ed. 1998); see generally, Fed.R.Civ.P. 56(c)(2).* Appellant respectfully asks that this Court interpret the aforementioned literally in keeping with affording the non-moving party reasonable inferences in its favor. That, is the District Court should have ruled that the emails and the statements they reflect constitute "material that <u>would</u> be admissible" at trial. In other words, for example, Plaintiff should have been afforded the opportunity to subpoena Allen Steinberg or even

Shenzhen Fenda for trial to adduce the testimony reflected in the emails, even if it had not done so at this summary judgment phase.

Indeed, the summary judgment rule provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *Fed. R. Civ. P. 56(c)(2)* (emphasis added). The Second Circuit has said that the party opposing summary judgment "cannot rely on inadmissible hearsay in opposing a motion for summary judgment[] absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985)* (internal citations omitted) (emphasis added). *See also, Selvam v. Experian Info. Solutions, Inc., 15-1264 (2nd Cir. Jun 07, 2016).* The District Court should have understood that Mr. Boyarsky would be called to testify at trial and have his credibility weighted and that, yes, even if Appellant chose not to undergo the expense of soliciting testimony from Shenzhen Fenda to defeat summary judgment,[7] it well might well do so for trial and most certainly would subpoena Allen Steinberg.

---

[7] It's actually extremely complicated to take a deposition in China. Under Articles 277 and 284 of the Civil Procedure Law of China, it is a crime for any individual within the borders of China to produce or obtain evidence in discovery for use in foreign courts without first obtaining permission from China's Central Authority in accordance with the procedures governing the Hague Convention. This includes producing documents located in China, providing live oral testimony in China, see YAN V. ZHOU, 2021 WL 4059478 (E.D.N.Y.), and offering remote video testimony while located in China, see JUNJIANG JI V. JLING INC., 2019 WL 1441130 (E.D.N.Y. 2019). This type of law prohibiting discovery is called a "blocking law." Other

It is true that a party seeking to defeat summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* This is not the case here. The Plaintiff provided affirmative testimony, emails and accompanying party deposition testimony that at least suggest there may be serious issues with how the products at issue came to be. The District Court should not have fact-finded or weighed that evidence; and the District Court should not have demanded fully-baked evidence and prohibitively expensive discovery to defeat summary judgment once Appellant made a clear showing that it had a case to make at trial.

To do so would have the effect of curtailing a Plaintiff's trial preparation. In this instance, for example, the District Court essentially demanded that the Plaintiff be trial-ready in opposing summary judgment, and the rules simply do not demand that. To prevail on its motion the Defendant must show that the Plaintiff cannot, under any circumstances, make its case. To defeat summary judgment, the Plaintiff should only be required to show its case, show what its (admissible) evidence consists of and map out its case were it allowed to go to trial.

---

countries, like France and India, have similar discovery blocking laws/ statutes. See AXTRIA, INC. V. OKS GROUP, LLC, 2021 WL 6136600 (E.D. Pa.). See https://www.languagealliance.com/blog/taking-discovery-in-china-for-use-in-u-s-litigation/

Court have demanded some "hard evidence"; but it often takes the form of a party's own testimony from personal knowledge, to "show[] that [his] version of events is not wholly fanciful," *D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).* That is sufficient to establish a genuine dispute of fact and should have been here.

The District Court should have refrained from assessing the competing evidence in the summary judgment record and should have avoided making credibility judgments. *See, e.g., Green v. Town of East Haven, 952 F.3d 394, 406 (2d Cir. 2020).* The District Court improperly weighed testimony and disregarded that Plaintiff did present "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).*

Did the Appellants raise a genuine issue of material fact? Absolutely. Did Appellant provide some evidence or showing that its position was not wholly fanciful? Absolutely. The District Court should have denied Defendants' motion for summary judgment.

E. The Exhaustion Doctrine Is Of No Avail In This Case

At root in this case is whether the Defendants can make use of the exhaustion doctrine and who bears the burden of proving it applies. Appellant contends that the analysis never reaches this point given the scant showing by

Defendants of red-herring documents and nothing but a whimsical, imaginary theory.

The exhaustion doctrine states that, "'[a]s a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner." *Polymer Technology Corp. v. Mimran, 975 F.2d 58, 61 (2d Cir. 1992) (internal citation omitted).* This idea is also referred to as the first sale doctrine, as it is in copyright law, "insofar as it recognizes that the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." *Bel Canto Design, Ltd. v. MSS Hifi, Inc., 837 F. Supp. 2d 208, 222 (S.D.N.Y. 2011)* (internal quotation marks and citations omitted). It would appear this is what the Defendants and the District Court were aiming towards in granting summary judgment to the defendants. The Court erred.

A court applying the exhaustion doctrine must do so in two steps:

- First, the court must consider whether the trademark owner authorized the first sale of the goods.

- Second, the court must consider whether the goods were genuine.

If the initial sale was authorized, the court must undertake the second part of the analysis and determine whether, as a matter of fact, the goods which were later resold without authorization were genuine. If the goods were genuine, there is no violation of the Lanham Act despite the fact that the goods were resold without the

trademark owner's consent. If the goods were not genuine, that is[,] altered or not in keeping with the trademark owner's quality standards, a valid claim for trademark infringement is established.  If the trademark owner did not approve the original sale, the goods cannot be considered genuine as a matter of law and infringement is established.  *Ryan, 107 F. Supp. 2d at 382; cf. Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 243 (2d Cir. 2009)* (holding that goods are not "genuine" if "they do not conform to the trademark holder's quality control standards, or if they differ materially from the product authorized by the trademark holder for sale" *(citing, inter alia, Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 78 (2d Cir. 1994)).*

For this reason, the exhaustion doctrine is most typically invoked by a downstream purchaser when "the initial sale of the trademarked goods was authorized, and the second or subsequent sale is contested." *Microban Prods. Co. v. Api Indus., Inc., 14 Civ. 41 (KPF) (S.D. N.Y. May 08, 2014), quoting Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc., 979 F. Supp. 224, 230 (S.D.N.Y. 1997) (internal citation omitted).*

It is well-settled that "[t]rademarked goods produced by a manufacturer under contract with the trademark owner are not genuine goods until their sale under the mark is authorized by the trademark owner." *Microban Prods. Co. v. Api Indus., Inc., 14 Civ. 41 (KPF) (S.D. N.Y. May 08, 2014), quoting Liz Claiborne,*

*Inc., 979 F. Supp. at 230 (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 24, comment c (1995) (internal quotation marks omitted, emphasis added)); see also El Greco Leather Products, Inc. v. Shoe World, 806 F.2d 392, 395 (2d Cir. 1986)* (absent trademark holders' consent to the original sale by shoe manufacturer, retailer's resales were not of genuinely-trademarked shoes); *By Design PLC v. Ben Elias Indus. Corp., No. 98 Civ. 4588 (LAP), 1998 WL 998964, at \*4 (S.D.N.Y. July 15, 1998)* ("Here, By Design denies that it authorized the sales in question, and defendant submits no admissible evidence to the contrary.")  Noteworthy is the court's language in *By Design PLC v. Ben Elias Indus. Corp.* wherein once the trademark owner denies having given consent, the burden was placed on the defendant to prove otherwise.

Generally, a former licensee may not invoke the exhaustion doctrine for any goods sold after the termination of the licensing agreement, even if they were manufactured while the agreement was still valid. *Microban Prods. Co., citing Ryan, 107 F. Supp. 2d at 382-83.* The logic underlying this maxim is that licensor's approval for any sales terminated along with the licensing agreement, irrespective of whether the goods were manufactured while the licensing agreement was valid. *Id.; see also Mktg. Products Mgmt., LLC v. Healthandbeautydirect.com, Inc., 333 F. Supp. 2d 418, 432 (D. Md. 2004)* ("a franchisor or similar licensor of trademarked goods and services has a federally-protected, enforceable right to

59

impose conditions on the use of its marks, and to withdraw its permission for the continued use of its marks, in interstate commerce so as to avoid a 'likelihood of confusion,' i.e., to protect its rights in maintaining the purity, quality, or soundness of its licensed goods and services" (internal citation omitted, emphases in original). Again, the Court below would agree, but say that the Plaintiff's haven't shown the termination of old "agreements" which, as stated above, improperly characterizes the three documents on the record and, second, misplaces the burden of proving the expiration of the "agreements" on the Plaintiff. Given that the "agreements" were decades old (if even binding on their face, complete or relevant), and given Plaintiff's testimony that for years there was no relationship with any "Fenda" manufacturer, the Court should have placed the burden of proving otherwise on the defendants. At minimum, the Court below should have left the issue to a jury.

By way of example, in Ryan, the court found that "neither the first sale rule nor the genuine goods doctrine serve[d] as a proper defense," because the defendant "had no right to sell Nolan Ryan products after its license was terminated regardless of when the goods were manufactured[, because] Plaintiff had not authorized the initial sale or released them into the stream of commerce." *107 F. Supp. 2d at 382-83*. Similarly, in Bill Blass, Ltd. v. SAZ Corp., the Third Circuit affirmed the issuance of preliminary injunction barring a former licensee from selling off its remaining inventory using the licensor's marks, noting that "the

licensee ... undertook the risk that if it kept its inventory at too high a level the inventory might not be sold by the expiration date of the license." *751 F.2d 152, 155 (3d Cir. 1984); see also Rogers v. HSN Direct Joint Venture, No. 97 Civ. 7710 (LLS), 1999 WL 728651, at \*2-3 (S.D.N.Y. Sept. 17, 1999)* (exhaustion doctrine permitted former licensee to sell only that product it had purchased through a third-party distributor, but not that product the former licensee had manufactured while the licensing agreement was still valid, and for which the former licensee did not have the licensor's approval to sell). Conversely, in *Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.,* a former licensee properly invoked the exhaustion doctrine where the parties had executed a post-termination agreement providing for a sell-off period of unsold inventory. *632 F. Supp. 1525, 1529 (S.D.N.Y. 1986).*

It follows, then, that the majority of cases in which the exhaustion doctrine was properly invoked were cases that involve downstream purchasers who purchased the goods from the Plaintiff, or from someone to whom the Plaintiff had initially sold those goods. *See, e.g., Polymer Tech. Corp., 37 F.3d at 80-81* (where Plaintiff had released its product into the stream of commerce by selling it to authorized distributors, the exhaustion doctrine applied to action brought against the defendant, who had purchased the product from authorized distributors and sought to resell it); *O.D.F. Optronics Ltd. v. Remington Arms Co., Inc., No. 08 Civ. 4746 (DLC), 2008 WL 4410130, at \*13 (S.D.N.Y. Sept. 26, 2008)* (finding

61

exhaustion doctrine applicable where "Remington purchased the EyeBall products in question from ODF, and as such there was a first sale from ODF to Remington that exhausted the patent and trademark rights that ODF seeks to vindicate"); *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005 (2d Cir. 1989)* (finding no consumer confusion for resale of a trademarked good).

There is no evidence that Defendants legitimately purchased the goods from the Plaintiff or an approved Plaintiff manufacturer; as a result, Plaintiff's right to control how Altec Lansing® product is sold was not yet "exhausted" by any first sale. In other words, Westview wasn't simply reselling Altec Lansing® product to a downstream purchaser, and so the exhaustion doctrine does not apply. Regardless of when the speakers in question were manufactured, AL Infinity "had not authorized the initial sale or released them into the stream of commerce." *See, Ryan, 107 F. Supp. 2d at 382-83; see also Microban Prods. Co. v. Api Indus., Inc., 14 Civ. 41 (KPF) (S.D. N.Y. May 08, 2014)*

Even if authorized at some point – and no court can say this on the present record as a matter of law – Defendants have not shown that the product at issue was genuine and comparable to historical Altec Lansing® product. Given the decade or so since any alleged consent was given, the defendants, not the plaintiff, should have borne this burden. In any case, Isaac Franco testified that the product at issue was outdated, had not been part of an Altec Lansing® product line in years

and, clearly, his company was not prepared to guaranty quality or honor any warranty. As far as the record goes, there was <u>no</u> due diligence or quality control during the subject transactions. This qualifies as a "material difference" in product.

**V.      The District Court erred by allowing Defendants' response to a cease and desist letter – itself hearsay being used to prove the truth of its content – to constitute evidence of non-willfulness.**

The District Court "note[d]" that "that the evidence is strong that any alleged counterfeiting was not willful." (A464) Again, the Court erred in so noting. The Court below based this conclusion onm three things: (a) that Boyarsky had a prior relationship with Westview and Steinberg and had known the two to be reputable sources from whom to purchase authentic goods" *Id.* and by virtue of their response to Appellant's initial "cease and desist" letter and alleged immediate removal of product from sale. *Id.* These facts are simply irrelevant and self-serving.

This Court reviews for clear error a district court's determination of willfulness. *4 Pillar Dynasty LLC v. N.Y. &amp; Co., 933 F.3d 202 (2nd Cir. 2019), citing Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995).*

The factors that support a finding of willfulness in a Lanham Act case mirror those that apply in suits brought under the Copyright Act, 17 U.S.C. § 504(c) : a plaintiff must show "(1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard ... or willful blindness." *Island Software & Comput. Serv., Inc. v. Microsoft Corp. , 413 F.3d 257, 263 (2d Cir. 2005)* (internal quotation marks omitted); *see also Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc. , 507 F. App'x 26, 31 (2d Cir. 2013)* (applying Copyright Act definition to Lanham Act claim) (summary order).

There is no dispute that no Defendant had no license to sell Altec Lansing® product, which should be sufficient. And if it were not sufficient, Westview also had no license and Crown Cell knew or should have known this. Knowingly trading in branded product without a license agreement is willful. At best, the Defendants in this case were willfully blind. In any case, if it did not agree that buying and re-selling without a trademark license is willful, the District Court should have left the matter to a jury.

In reviewing and affirming the District Court's finding of willfulness in *4 Pillar Dynasty LLC* (noting that the issue was determined at trial, not as a matter of law) the Second Circuit noted that Plaintiffs presented no direct evidence of Defendants' state of mind in using the subject brand but that the District Court, rather, relied in part on Defendants' failure to stop selling the infringing goods

after the action was filed and that the "use of the word 'Velocity' on the defendants' products was, on its face, a blatant infringement." *4 Pillar Dynasty LLC, 257 F. Supp. 3d 611 at 620–22 (S.D.N.Y. 2017).* In other words, ceasing sale activity supported a finding of willfulness, not the opposite.[8]

## VI. The District Court erred in dismissing trademark causes of action *sua sponte* and not allowing the trademark claims to survive even if there was no counterfeiting.

There is no dispute that neither Westview nor Crown Cell had licenses to manufacture (or have manufactured for it) Altec Lansing® product. Even if at one time their supplier did (although the record is clear that they did not know), the continued use of a mark by an ex-licensee can constitute a trademark infringement. *Chanel Inc. v. WGACA, Inc., No. 18-cv-2253 (LLS), 2022 WL 902931, at \*15 n. 9 (S.D.N.Y. Mar. 28, 2022).* "When an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law." *L&L Wings, Inc., 676 F. Supp. 2d at 188 citing Ryan v. Volpone Stamp. Co., 107 F. Supp. 2d 369, 399 (S.D.N.Y. 2000)); accord C=Holdings B.V. v. Asiarim Corporation, No. 12 Civ. 928 (RJS), — F. Supp. 2d —, 2013 WL 6987165, at \*10*

---

[8] The Second Circuit conceded that "[a[ defendant might decline to halt sales of a challenged product in a manner consistent with non-willful infringement," if "careful due diligence in response to an infringement claim leads it to believe reasonably that it has not infringed." *4 Pillar Dynasty LLC v. N.Y. &amp; Co., 933 F.3d 202, 210 (2nd Cir. 2019)* No such showing was made here.

*(S.D.N.Y. Dec. 16, 2013); see also Bowmar Instrument Corp. v. Continental Microsystems, Inc., 497 F. Supp. 947, 959 (S.D.N.Y. 1980)* (holding that continued use of a mark after termination of a license constitutes trademark infringement).

Where an ex-licensee continues to use a mark after its license expires, a strong likelihood of consumer confusion arises. *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology, 794 F.2d 38, 44 (2d Cir. 1986).* See also *Burberrys (Wholesale) Ltd. v. After Six Inc., 471 N.Y.S.2d 235, 122 Misc.2d 561 (N.Y. Sup. Ct. 1984)* (continued use of trademark after licensor prohibits continued manufacture or sale would cause confusion irreparable harm), *citing Burger King Corp. v. Mason, 710 F.2d 1480 (11th Cir.1983); United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134 (3rd Cir.1981); Professional Golfers Ass'n v. Bankers L. & C. Co., 514 F.2d 665 (5th Cir.1975), and Bowmar Instrument Corp. V. Continental Microsystems, Inc., 497 F. Supp. 947, 957 (S.D.N.Y.1980)* (licensor can obtain injunctive relief to prevent ex-licensees from continuing to use the plaintiff's trademarks).

This is because, "[i]n such situations, confusion is almost inevitable [as] consumers have already associated the formerly licensed infringer with the trademark owner." *Id.* Put another way, "[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604*

*F.2d 200, 205 (2nd Cir. 1979)*. "In such situations, confusion is almost inevitable because consumers have already associated the formerly licensed infringer with the trademark owner." *Microban Prods. Co. v. Api Indus., Inc., 14 Civ. 41 (KPF) (S.D. N.Y. May 08, 2014), citing L & L Wings, 676 F. Supp. 2d at 188 (citing Ryan, 107 F. Supp. 2d at 399)*.

Presumably, one reason for this is that with an active license comes quality control, approvals, the requirement for warranty and customer service guidelines. There are permitted distribution channels in which product may be sold through in order to protect the integrity of the brand. There are marketing requirements and guidelines and return policies. Outside of a license agreement term, however, none of this accompanies the sale of a product and all of the above (and more) are compromised.

Therefore, a previous licensee that continued to use a licensor's marks after the expiration of the License Agreement yields a likelihood of consumer confusion with respect to the subject trademarks and the source of the goods in question – not only the manufacturing source, but the selling source; and not only confusion, but dilution may also exist in these situations. If a licensee continues using a trademark after the license agreement has expired, they weaken the distinctiveness or reputation of the trademark, as has been alleged (and testified to). For example, by selling products in the fast-paced ever-changing world of consumer electronics

long after their original license term, the Defendants affect the Plaintiff's reputation because of the outdated nature of the goods; they deceive consumers who now believe that the owners of the Altec Lansing® brand do not update their product line and are not innovative, have no quality control, customer service, warranty or return policy.[9]

The Court below did agree that the continued use of a mark by an ex-licensee can constitute a trademark infringement (A471), citing *Chanel Inc. v. WGACA, Inc.,* but, as stated above, left it to the Appellant to prove that Shenzhen Fenda was an ex-licensee (A472).  As shown above, Shenzhen Fenda was never shown to have been a licensee in the first place!  The District Court erred in its factual oversight with respect to the two "Fenda" entities; the District Court erred in its misreading of red-herring "agreements," and, even were those two issues were to be resolved in favor of the Defendants, the District Court erred its assigning of the burden of proof on the issue to the plaintiff under these circumstances.

---

[9] The Defendants' moving papers showed screen shots of the product in question being offered for sale on the internet and the accompanying confusion.  The item description has a caption "From the Manufacturer," (A201) which is obviously misleading.  Customers posted feedback on that very site demonstrating (among some good reviews) of customer <u>dis</u>satisfaction with the older technology (perhaps once deemed sufficient, but now outdated), with the quality control, the warranty and with the poor customer service. One review from 2018 said "Don't Do It!" and that "these are easily the poorest mini-speakers I've ever heard." (A207)  A 2020 review said "Apparently their quality control is absolute garbage." (A248)

Thus, the Court should <u>not</u> have imposed summary judgment *sua sponte* with respect to the claims for which the Defendant did not even move and should have allowed the same to proceed to trial.

## CONCLUSION

For the reasons stated herein, Appellant respectfully asks that this Court reverse the decision of the District Court, deny Defendants' motion for summary judgment and either grant Plaintiff's cross-motion on all counts or remand to the District Court for trial.

Dated:      New York, New York
            September 3, 2024

                          Respectfully submitted,

                          THE LAW FIRM OF JEFFREY S. DWECK, P.C.
                          By:  Jeffrey Dweck (JD 6658)

                          43 West 33rd Street, Suite 304
                          New York, New York 10001
                          (212) 967-0500
                          Attorneys for Plaintiff
                          AL Infinity LLC, doing business as Altec
                          Lansing

Certification per Fed. R. App. P. 32(a)(7)(C)

This is to certify that the foregoing brief complies with the 14,000 word limitation requirement of Fed. R. App. P. 32(a)(7)(B), in that the brief is calculated by the word processing program to contain approximately 13,926 words, exclusive of the Table of Contents, Table of Authorities, Statement of Jurisdiction and Statement of the Issues Presented.

Dated: New York, New York
        September 3, 2024

Jeffrey Dweck

SUBMITTED BY:

THE LAW FIRM OF JEFFREY S. DWECK, P.C.
43 West 33rd Street - Suite 304
New York, New York 10001
212-967-0500
jeffrey@dweckny.com
Attorneys for Plaintiff

**SPECIAL APPENDIX**

## **Table of Contents**

**Page**

Memorandum and Order of the Honorable
    Naomi Reice Buchwald, dated August 9, 2023 .............................. SPA1

Judgment of the United States District Court, Southern District
    of New York, entered August 9, 2023 ............................................ SPA32

Judgment of the United States District Court, Southern District
    of New York, entered May 1, 2024 ................................................. SPA33

Memorandum and Order of the Honorable
    Naomi Reice Buchwald, dated May 1, 2024 ................................. SPA34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
AL INFINITY, LLC,

             Plaintiff,

     - against –

CROWN CELL, INC., HERSCHEL
SPALTER, ISSER BOYARSKY and
DOES 1-10,

             Defendants.

------------------------------X

**MEMORANDUM AND ORDER**

20 Civ. 4813 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

From early on in this litigation, the Court and the parties have been aware of the sole issue in the case -- whether the sale by defendants of two models of speakers bearing the Altec Lansing trademark was legitimate or counterfeit.  The confusion on this seemingly simple and fundamental question arose from the fact that the speakers at issue were purchased from entities that were, at least previously, authorized by the Altec Lansing trademark owners to produce and distribute their products.

Plaintiff AL Infinity LLC ("AL Infinity" or "plaintiff") is the most recent owner of the Altec Lansing trademark, which had earlier been owned by Altec Lansing Technologies, Inc., Plantronics, Inc., and Altec Lansing, LLC ("plaintiff's predecessors").  Plaintiff's predecessors had relationships with third-party defendant Westview Industries, Inc. ("Westview") and

with an affiliate of Shenzhen Fenda Technology Co., Ltd. ("Fenda") to distribute and supply products.

In 2016 and 2017, defendant Crown Cell, Inc. ("Crown Cell"), founded by defendant Herschel Spalter ("Spalter"), purchased two types of Altec Lansing speakers from Westview and then resold the speakers on Amazon.com and Walmart.com. Specifically, Crown Cell employee, defendant Isser Boyarsky ("Boyarsky," and collectively with Crown Cell and Spalter "defendants"), contacted Westview to purchase the items, as he had previously worked with Westview to buy these types of goods. In turn, Westview contacted Fenda to fill the order.

However, when plaintiff saw the speakers for sale, it sent defendants a cease-and-desist letter, to which defendants immediately complied, while noting that they had purchased the goods from what they thought to be a legitimate vendor. Eventually, plaintiff filed the present suit, asserting a list of claims that all turned on whether the goods were counterfeit.

As noted, the factual question of whether the goods were actually counterfeit was identified at the onset, and plaintiff has been given several opportunities to learn the facts regarding these goods. Despite these chances and its burden, plaintiff has failed to do so, yet nevertheless now seeks summary judgment. In turn, defendants have cross-moved for summary judgment regarding

only the first cause of action for trademark counterfeiting.  For the reasons stated below, plaintiff's motion is denied in its entirety and defendants' motion is granted in its entirety.

BACKGROUND

### I.   Procedural History

Plaintiff filed its complaint on June 24, 2020.  <u>See</u> ECF No. 7.  After defendants sought to dismiss the complaint, plaintiff filed an amended complaint on March 15, 2021, asserting five causes of action: (1) federal trademark counterfeiting under 15 U.S.C. § 1114; (2) federal trademark infringement under 15 U.S.C. § 1125(A); (3) injury to business reputation and state anti-dilution; (4) deceptive trade practices; and (5) common law unfair competition.  <u>See</u> ECF No. 26.  Defendants answered and then filed a third-party complaint against Westview on March 29, 2021.  ECF Nos. 27- 28.

After over a year of discovery, defendants sought leave to move for summary judgment on the federal counterfeiting claim, and their application was subsequently joined by third-party defendant Westview.  <u>See</u> ECF Nos. 45, 47.  However, plaintiff opposed the motion and requested additional discovery.  <u>See</u> ECF No. 46.  The Court then held a conference on June 29, 2022 regarding the proposed motion, during which it explicitly addressed plaintiff's burden to prove that the products were not authorized.  The Court

inquired whether plaintiff was planning to seek discovery from Fenda. Despite indicating its willingness to seek discovery from Fenda during the conference, plaintiff's subsequent proposal regarding the remaining discovery failed to include it. See ECF No. 48. The Court, in explaining the deficiencies in that proposal, once again reminded plaintiff of the "centrality" of a deposition of Fenda. ECF No. 51.

Nonetheless, in response to the Court's remarks, plaintiff stated that it "does not intend to depose a representative of Fenda" but now stated it would attempt to secure some emails and documents from Fenda. See ECF No. 52. Instead, it sought two party depositions. Id. The Court granted plaintiff's request for the two additional depositions and gave plaintiff another 90 days to complete discovery related to counterfeiting, at the conclusion of which defendants were permitted to make their motion. ECF No. 55. After the 90-day period elapsed, plaintiff, for the first time, sought permission to cross-move, and the Court entered a briefing schedule. See ECF Nos. 56, 59.

On January 5, 2023, defendants filed their motion for summary judgment, which included a memorandum of law, a Rule 56.1 Statement, the declaration of Coby Nixon with several exhibits ("Nixon Decl."), and a request to seal certain facts and exhibits. See ECF Nos. 60-68. A month later, plaintiff filed its opposition

to defendants' motion and a cross motion for summary judgment, which included a memorandum of law, a counterstatement to defendants' Rule 56.1 Statement, the declarations of Isaac Franco and Allen Steinberg, and a similar request to seal.  See ECF Nos. 70-77.  Finally, on March 2 and March 16, 2023 respectively, defendants filed their reply and opposition to plaintiff's motion, see ECF Nos. 79-80, and plaintiff filed its reply, see ECF No. 81-82.[1]

## II.  Local Rule 56.1 Statements

Before providing the factual background, the Court is compelled to address plaintiff's failure to adhere to Local Rule 56.1.  Local Rule 56.1 requires that a party moving for summary judgment submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," Local R. 56.1(a), and for the party opposing summary judgment to submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." Local R. 56.1(b). "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would

---

[1] While the Court permitted third-party defendant Westview to submit briefing materials, see ECF No. 59, none were submitted.

be admissible, set forth as required by Fed. R. Civ. P. 56(c)."
Local R. 56.1(d).  These rules governing summary judgment "are
essential tools for district courts, permitting them to
efficiently decide summary judgment motions by relieving them of
the onerous task of hunting through voluminous records without
guidance from the parties."  N.Y. Teamsters Conference Pension &
Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 649 (2d Cir. 2005)
(internal quotation marks omitted).

Despite moving for summary judgment, plaintiff has submitted
a wholly deficient Rule 56.1 statement and response.  It is
striking that plaintiff's statement of facts includes just
fourteen paragraphs to support its motion for summary judgment on
five causes of action.  See ECF No. 75 ¶¶ 54-67.  Moreover, each
paragraph is supported with only a reference to either the
declaration of Isaac Franco, the managing member of AL Infinity,
or the declaration of Allen Steinberg, an officer of third-party
defendant Westview.  See ECF Nos. 73, 64.  The declaration of
Franco, which contains the bulk of the factual allegations, goes
far beyond his own personal knowledge and fails to cite other
evidence supporting the propositions.[2]  See Declaration of Isaac
Franco ("Franco Decl."), ECF No 73.  The only evidence referenced

_____

[2] On the other hand, the declaration of Allen Steinberg attempts to authenticate
emails between Steinberg and representatives of Fenda.  See Decl. of Allen
Steinberg ("Steinberg Decl."), ECF No. 74.

within the declaration are emails on which Mr. Franco was not included and the deposition of another witness in the case.  This is simply improper.  Moreover, by structuring the facts in this way, defendants responded, pursuant to the local rules, to each paragraph in the Rule 56.1 statement, but not to plaintiff's additional allegations in the declarations.

The Court has "considerable discretion in fashioning a remedy to address Plaintiff's failure to submit a Rule 56.1 statement in conformity with the Local Rules."  Emanuel v. Griffin, No. 13-cv-1806 (JMF), 2015 WL 1379007, at *2 (S.D.N.Y. Mar. 25, 2015).  "[W]here there are no citations or where cited materials do not support factual assertions in the [Rule 56.1 statements], the Court is free to disregard the assertion."  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (quoting Watt V. N.Y. Botanical Garden, No. 98-cv-1095 (BSJ), 2000 WL 193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000)) (internal alterations omitted).  Thus, the Court will not consider any unsupported alleged facts or assertions, and even if considered, will note the limitations of the evidence in the analysis below.

Plaintiff's responses to defendants' Rule 56.1 statement fare no better.  Plaintiff cursorily denies many of the allegations, routinely responding to defendants' factual assertions with: "Plaintiff has no knowledge of the aforementioned and asserts that

Defendants have produced no evidence which would be admissible at trial, in support of the foregoing." See Counterstatement to Rule 56.1 Statement ("Pl. 56.1"), ECF No. 75. This response, contrary to the local rule, does not identify any fact in the record that refutes or challenges defendants' assertion, nor does it identify the specific objection. "Responses of this nature, which do not point to any evidence in the record that may create a genuine issue of material fact, do not function as denials, and will be deemed admissions of the stated fact." Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454, 458 (S.D.N.Y. 2011) (citing cases); see also Feis v. U.S., 394 F. App'x 797, 799–800 (2d Cir. 2010) (summary order).

The Court is, however, mindful that "[t]he local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and [that] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." Holtz, 258 F.3d at 74. As a consequence, rather than "streamlin[ing] the consideration of [the pending] summary judgment motions" as the local rule intended, id., the net effect of plaintiff's deficient submissions is to impose upon the Court the added burden of combing through the record to assure itself that the asserted facts are supported by admissible evidence.

Accordingly, where the Court relies on uncontroverted or improperly controverted paragraphs in defendants' 56.1 statements, it does so only where the record duly supports defendants' contentions. This is precisely what Local Rule 56.1 was designed to avoid.

### III. Factual Background

#### a. Relationship between Altec, Westview, and Fenda

AL Infinity is the trademark owner of the consumer electronics brand Altec Lansing, which manufactures, imports, sells (or licenses to others to manufacture and sell) consumer electronics. Franco Decl. ¶ 2. While the trademarks date as early as 1956, plaintiff only acquired the rights in 2012. Def. Statement of Material Facts ("Def. 56.1") ¶¶ 7-8. From its inception until 2006; Altec Lansing Technologies, Inc. owned the trademark. Thereafter, it was owned by Plantronics, Inc. from 2006 to 2009 and by Altec Lansing, LLC from 2009 to 2012. Id. ¶ 9.

Core to this dispute, these predecessors had relationships with both an affiliate of Fenda and third-party defendant Westview. For instance, the record includes a 2004 Memorandum of Understanding between Altec Lansing Technologies Inc., the original trademark owner, and an affiliate of Fenda, called ShenZhen Baon Fenda Industrial Co., Ltd., which stated that "both parties wish to enter a customer/supplier arrangement." Id. ¶ 15;

Nixon Decl., Ex. 6, ECF No. 63. Additionally, Plantronics, Inc. entered into a Vendor Management Inventory Addendum with the same Fenda affiliate in 2009, in which Fenda agreed to supply certain goods to Plantronics.[3] Def. 56.1 ¶ 16; Nixon Decl. Ex. 7.

Similarly, there is evidence in the record that at least one of plaintiff's predecessors also had a relationship with Westview to distribute Altec Lansing goods. Specifically, in 2003, Plantronics entered into the Sales Representative Agreement with Westview. Under this agreement, Westview would solicit orders for products bearing Altec Lansing Trademarks.[4] Def. 56.1 ¶ 11; Nixon Decl. Ex. 5.

### b. Purchase of Speakers by Crown Cell

Founded in 2014 by defendant Herschel Spalter, defendant Crown Cell operates an online marketplace through which it sells products to consumers. Def. 56.1 ¶¶ 3, 21. In 2016 and 2017,

---

[3] The agreement notes that the specific goods are listed in Exhibit A to the agreement, however, this exhibit was not included in the document provided as Exhibit 7 to the Nixon Declaration.

Additionally, the Court notes that it does not consider defendants' allegation that in 2012 Fenda was granted "a license to sell products under Altec LLC's brand name using the materials already procured to fill Altec LLC's prior order." Nixon Decl. Ex. 9. at 5. The only support for this fact is an order granting a motion to dismiss from Judge Curiel in the Southern District of California, which relies on the allegations of a complaint filed by Shenzhen Fenda Technology Co., Ltd. against Altec Lansing. The statement in a complaint by a third party is not admissible here.

[4] Once again, although defendants reference another agreement with Westview, Def. 56.1 ¶ 13, the support listed in the Rule 56.1 statement is inadmissible under Federal Rule of Evidence 408, and therefore the Court does not consider this in its analysis.

Crown Cell purchased two models of Altec Lansing speakers –- VS4621 and BXR1220. These speakers were an older set of wired desktop speakers that included copyright notices from 2008-2010, 2010, and 2012, and had been available on the market since at least 2009. Def. 56.1 ¶¶ 31-33.

Crown Cell purchased the speakers directly from Westview. Id. ¶ 26. Specifically, Crown Cell's employee, defendant Boyarsky contacted Allen Steinberg at Westview to order the speakers. Id. ¶ 25. Boyarsky testified that this was not his first experience with Steinberg or Westview, as he had worked with Westview and Steinberg for years during a prior employment. Id. ¶¶ 34, 37. He testified that he "had full faith in Westview," as he had known Westview for years and "knew they were a reputable firm for many years." Id. ¶ 34.

To supply Crown Cell with the speakers, Westview in turn purchased them from Fenda, a Chinese entity. Id. ¶ 29. It is unclear from the record exactly what Fenda did in order to supply the speakers to Westview. Plaintiff argues that Fenda "manufactured" the speakers in 2016 and 2017, offering for support two sets of emails attached to or screenshotted in the declarations of Franco and Steinberg.[5] Pl. Mem. of Law ("Pl. Br.") at 9, ECF

_____

[5] As noted earlier, this submission is contrary to Local Rule 56.1.

No. 76.  The first set of emails contains communications between Boyarsky at Crown Cell and Steinberg at Westview, in which there are references to an approximately one-month "lead time," as well as "factory production times" for the speakers.  See Franco Decl. ¶¶ 33-38.

The second set of emails are between Steinberg and employees at Fenda.  While the Court doubts the admissibility of these emails, they contain similar statements regarding "lead times," the "completion of goods," and Fenda's ability to "produce goods."[6] See Id. ¶¶ 59-67.  At best, Fenda states that it needs to "reorder materials" and "produce the goods [with] almost 90% [] new materials."  Id. ¶¶ 64, 67.

Overall, between March 2016 and January 2017, Westview purchased from Fenda and sold to Crown Cell 10,456 units of the two speakers.  Def. 56.1 ¶ 29.  Once defendants received the speakers, they offered them for sale on Amazon.com and Walmart.com and ultimately sold 6,705 of the speakers.  Id. ¶¶ 38-39.

### c. Cease-and-Desist Letter

After plaintiff learned of defendants' sales, it sent a cease-and-desist letter to Crown Cell on May 4, 2017.  Id. ¶ 41.  The next day Crown Cell responded, stating,

---

[6] As discussed in footnote 9, defendants argue and the Court agrees that emails with Fenda are hearsay.

> Please be advised that we have purchased the Altec
> Lansing speakers from Allen Steinberg at West-view
> industries he has a very close relationship with the
> infinity group and we have forwarded this to him.  He
> assured us he will reach out to the the [sic] infinity
> group and will resolve any issues . . . For the time
> being we have removed our listing from Walmart.com.

Id. ¶ 42; Nixon Decl. Ex. 10.  Crown Cell testified that it
ultimately disposed of the remaining inventory "to avoid having to
pay storage costs."  Id. ¶ 45.

## STANDARD OF REVIEW

Summary judgment is properly granted where "there is no
genuine dispute as to any material fact and the movant is entitled
to judgment as a matter of law."  Fed. R. Civ. P. 56.  "A genuine
issue of material fact exists if 'the evidence is such that a
reasonable jury could return a verdict for the non-moving party.'"
Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107,
113-14 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986)).  The movant "always bears the initial
responsibility of informing the district court of the basis for
its motion," as well as the basis for any absence of material fact
in dispute.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
In "moving for summary judgment against a party who will bear the
ultimate burden of proof at trial, the movant must satisfy this
burden by pointing to the absence of evidence to support an
essential element of the non-moving party's claim."  Gummo v. Vill.

of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996). Courts must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Gilman v. Marsh & McLennan Cos., Inc., 826 F.3d 69, 73 (2d Cir. 2016).

If the moving party makes a showing that it is entitled to summary judgment, "[t]hen the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008). The non-moving party "may not merely rest on the allegations or denials of his pleading; rather his response . . . must set forth 'specific facts' demonstrating there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). A "scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. "If no rational fact finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is appropriate." Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 710 (2d Cir. 1991).

## DISCUSSION

As noted previously, both parties seek summary judgment, with plaintiff moving for summary judgment on all five counts and

defendants moving for summary judgment on only the federal counterfeiting claim. The Court first addresses the federal trademark counterfeiting claim and finds that plaintiff has failed to provide evidence that the goods were actually counterfeit. Having failed to meet its burden, plaintiff's motion is denied and defendants' motion for summary judgment is granted. The Court then evaluates the remaining four causes of action, and for the same reasons, denies plaintiff's motion for summary judgment on each count.

## I.    Counterfeiting Under 15 U.S.C. § 1114

The Lanham Act (the "Act") provides protection when, "without the consent of the registrant," a person "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. §1114(1). To establish infringement, courts evaluate whether there is a likelihood of confusion, employing the factors set out in the Second Circuit decision in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961). If infringement is established, plaintiff can seek compensatory damages or disgorgement of infringer's profits. 15 U.S.C. § 1114.

However, the Act provides special rules and enhanced remedies when use of the mark transcends simple trademark infringement and instead involves counterfeiting.  Counterfeiting is considered to be the "'hard core' or 'first degree' trademark infringement that seeks to 'trick the consumer into believing he or she is getting the genuine article.'"  Gucci Am., Inc. v. Guess?, Inc., 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012) (quoting 4 McCarthy on Trademarks and Unfair Competition § 25:10 (5th Ed.)).  The Act defines a counterfeit mark as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127.

Substantively, there are two main differences when evaluating a claim for counterfeiting compared to one for simple infringement.  First, if there is counterfeiting, confusion is presumed.  When a case involves counterfeit products, "it is not necessary to perform the step-by-step examination of each Polaroid factor because counterfeit marks are inherently confusing."  Fendi Adele S.R.L v. Filene's Basement, Inc., 696 F. Supp. 2d 368, 383 (S.D.N.Y. 2010) (quoting Burberry Ltd. v. Euro Moda, Inc., No. 08-cv-5781 (CM), 2009 WL 1675080, at *8 (S.D.N.Y. June 10, 2009)).  And second, because the law views counterfeiting as a more serious form of infringement, the statute provides for additional remedies.  For instance, a plaintiff can seek ex parte seizure orders, 15 U.S.C.

§ 1116; statutory damages, id. § 1117(c); and treble damages, id. § 1117(b).  As for statutory damages, if the infringement involves counterfeiting, the plaintiff can elect statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold."  Id. § 1117(c).  If the counterfeiting is willful, plaintiff can seek even greater statutory damages, up to $2,000,000 per counterfeit mark per type of good.  Id.

In order to prove counterfeiting, a plaintiff needs to show that the goods are not genuine, and instead contain a "spurious mark."  15 U.S.C. § 1127.  The Act does not further define counterfeit goods.  However, in seeking any of the special remedies (i.e., statutory damages, treble damages, or ex parte seizure orders), the Act specifically excludes "any mark or designation used on or in connection with goods or services of which the manufacture [sic] or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation."  15 U.S.C. § 1116(d).  This "effectively excludes parallel imports, gray goods and production overruns from the definition." 4 McCarthy on Trademarks and Unfair Competition § 25:15 (5th Ed.); see also Chanel Inc. v. WGACA, LLC, No. 18-cv-2253 (LLS), 2022

U.S. Dist. LEXIS 55880, at *40 n.9 ("A counterfeit is a copy which is so close that it is difficult to tell from an original.  Thus, a shoe which is made in the manufacturer's factory, and meets it [sic] specifications, but is unauthorized for sale, is an infringement, but not a counterfeit.")  Therefore, if a good is produced by an authorized manufacturer, it is not considered to be counterfeit.

Both parties believe they are entitled to summary judgment as to trademark counterfeiting, with defendant splitting its motion into two parts:  (1) that the counterfeiting claim fails as a matter of law; and (2) that, even if there was counterfeiting, plaintiff is not entitled to enhanced damages for willful counterfeiting, as it was not willful.  The Court begins with plaintiff's motion and then evaluates defendants' motion.

### a. Plaintiff's Motion for Summary Judgment

Plaintiff argues it is entitled to summary judgment on the counterfeiting claim.  Plaintiff's motion is denied because, despite the additional time to build a factual record, plaintiff has failed to establish the basic fact that the goods were counterfeit.

First and foremost, plaintiff never purchased or inspected the speakers at issue to evaluate if they differed in any way from authentic goods.  This litigation failure deprives the Court of

the most effective tool it has to determine whether a plaintiff has met its burden at summary judgment, namely a side-by-side comparison revealing whether there are slight deviations between the goods at issue and the authentic goods. See Gucci Am., Inc. v. Duty Free Apparel, Ltd., 286 F. Supp. 2d 284, 288 (S.D.N.Y. 2003); Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp., 689 F. Supp. 2d 585, 597 (S.D.N.Y. 2010), amended on reconsideration (Mar. 23, 2010); Fendi, 696 F. Supp. 2d at 383-384; see also Chanel, 2022 U.S. Dist. LEXIS 55880, at *42-*44 (holding plaintiff met its prima facie burden when it offered evidence that plaintiff's internal records did not include products with that serial number and the products did not conform to plaintiff's standards); Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 243 (2d Cir. 2009) (upholding grant of preliminary injunction). In fact, in this Court's experience, it is routine for a plaintiff in a trademark suit to buy an allegedly infringing product. Yet, at no point before or after filing the suit was this simple effort taken.[7] If it had been, plaintiff could have put to bed once and for all the core issue in the case.

---

[7] The Court is aware that the speakers were eventually destroyed. According to defendants, they were complying with the cease-and-desist request not to sell the disputed products and accordingly could not continue to pay for the storage fees. Def. 56.1 ¶ 45.

Second, no effort was made to obtain discovery from Fenda. The Court identified early on in the litigation that discovery from the Chinese entity would be central to determining whether the goods were counterfeit. The Court raised this issue with the parties and even provided additional time after discovery had concluded to pursue this line of inquiry. However, defendant informed the Court it would not seek any depositions from Fenda, see ECF No. 52, and the Court is not aware of any subpoena sent to Fenda. This is striking given that plaintiff alone bears the burden to prove counterfeiting in a case it claims is worth $4 million. Pl. Br. at 18.

Instead, plaintiff rests its case entirely on two sets of vague emails included within or as attachments to the two declarations filed with its motion.[8] Plaintiff suggests that these emails establish that "the Altec Lansing product at issue was manufactured when ordered in 2016 and 2017, not before." Pl. Br. at 9.

The first set of emails between Boyarsky at Crown Cell and Steinberg at Westview simply references the approximately one-month "lead times" and "factory production times" for the speakers. See Franco Decl. ¶¶ 33-38. These references to "production" are

_____

[8] As noted previously, this is not in compliance with Local Rule 56.1 and the Court is permitted to disregard these statements. Nonetheless, we will evaluate the emails.

insufficient as there is no other evidence describing what was actually done to produce the goods. If anything, the fact that the lead times are relatively short (about 30 days) weighs against plaintiff's presumption that the products were entirely produced when ordered.

Likewise, the second set of emails between Steinberg and employees at Fenda cannot meet plaintiff's burden. First, aside from the deficiencies in the Rule 56.1 statement, the Court has serious concerns about their admissibility. Defendants argue, and the Court agrees, that the emails, and in particular the statements of Fenda, are hearsay.[9] Def. Reply Mem. of Law. at 5-6, ECF No. 79.

---

[9] Defendants argue that the statements of the Fenda employees are hearsay and inadmissible. Plaintiff responds that the emails are admissible as: (1) business records; (2) adoptive admissions; (3) statements against interest; or (4) statements related to state of mind. Pl. Reply at 3-8, ECF No. 81. The Court is not convinced that the emails fall into any of these exceptions or exclusions.

First, under Rule 803(6), for a document to be considered a business record, it must be shown that: (1) the record was made "at or near the time by . . . someone with knowledge," (2) in the course "of regularly conducted [business] activity," and (3) that creating the record "was a regular practice of that activity." Fed. R. Evidence 803(6). The rule requires the "testimony of the custodian or another qualified witness or by a certification." Id. Here, there is no certification that these emails were produced in the normal course of business. Further, even the accompanying Steinberg declaration does not state the emails were produced in the normal course of business. See ECF No. 74.

Moreover, plaintiff seeks to admit the statements made by third-party Fenda in these emails, and there is absolutely no evidence that Fenda sent these emails as part of the normal course of business. While "[a]n email could conceivably qualify as a business record if, for example, it confirms a sale," when the emails, as is the case here, "contain unique and sporadic communications, not created as a record of any 'regularly conducted business activity,'" they are not admissible under Rule 803(6). New World Trading Co. Ltd. v. 2 Feet Productions, Inc., Nos. 11-cv-6219, 13-cv-1251, 2014 WL 988475, at *1 (S.D.N.Y. Mar. 13, 2014).

Nevertheless, even if the Court were to consider the emails, which it need not, they are not the "smoking gun" evidence that plaintiff touts them to be. At best, the emails contain statements from Westview referencing Fenda's ability to "produce goods," the "lead times" needed, and the "completion of production," and a statement by Fenda that it needed to "reorder materials" and "produce the goods [with] almost 90% [] new materials." See Franco Decl. ¶¶ 59-67. Once again, the record contains no detail as to what Fenda actually did to "produce" the goods and whether that production alone made the goods counterfeit. Plaintiff cannot fail to investigate and then rely on ambiguity to prove its case.

Next, plaintiff argues that Westview adopted the admissions of Fenda, and therefore they are not hearsay under Federal Rule of Evidence 801(d)(2)(B). To adopt the statements in a document, the adoptive party needs to "accept[] and act[] upon the evidence." Wright-Simmons v. City of Oklahoma City, 155 F.3d 1264, 1268 (10th Cir. 1998). For instance, seeking an employee's resignation was considered to be an adoption of an investigation report, id. at 1268-1269, and implementing recommendations in a report was considered to be action upon and adoption of the report, Pekelis v. Transcontinental & Western Air, Inc., 187 F.2d 122, 128-129 (2d Cir. 1951). Here, plaintiff only states that by buying the goods, third-party defendant Westview adopted Fenda's statements as to the production of the goods. Pl. Reply at 7. The Court is not convinced this action was an adoption of Fenda's statements.

Plaintiff then claims that Fenda's statements are admissions against interest under Rule 804. Aside from the fact that Fenda is not unavailable as is required by Rule 804, the rule also requires that the statement be "so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or monetary liability." Fed. R. Evid. 804(b)(3)(A). The Court does not believe the email is the "smoking gun" plaintiff alleges, and as such is not sufficiently against Fenda's interest.

Finally, plaintiff's argument that the emails "reflect [Fenda's] state of mind, i.e., motive intent or plan (in this case to proceed with a purchase of the goods in question)" also fails. Pl. Reply at 8. Fenda's statements are not being offered for its state of mind, but for the truth of the matter asserted.

Further, even if Fenda did entirely manufacture the speakers in 2016 and 2017, plaintiff does not provide any evidence that Fenda was not permitted to do so. According to the Lanham Act, if "at the time of the manufacture or production in question," the producer or manufacturer was "authorized to use the mark or designation for the types of goods," then the goods are not considered to be counterfeit. 15 U.S.C. § 1116(d). Here, the record contains no evidence as to who was permitted to manufacture the goods or, alternatively, that the speakers were no longer authorized to be in production at that time. This is evidence uniquely within plaintiff's control, and the absence of this evidence is telling, given the evidence in the record that a Fenda affiliate was at one point authorized to produce Altec Lansing goods.

Ultimately, plaintiff cannot fail to produce evidence and nevertheless seek victory. Therefore, the Court denies plaintiff's motion for summary judgment.

### b. Defendants' Motion for Summary Judgment

In addition to opposing plaintiff's motion for summary judgment, defendants have affirmatively moved for summary judgment on the counterfeiting claim, maintaining that: (1) plaintiff failed to meet its burden that the goods were counterfeit; and

(2) even if they were counterfeit, the defendants did not act willfully. The Court fully agrees.

First, as defendants do not bear the burden of proof, they only need to "point[] to an absence of evidence to support an essential element of the non-moving party's claim." Gummo, 75 F.3d at 107. Defendants have met their prima facie burden for the same reasons that plaintiff's motion for summary judgment fails. Plaintiff has failed to present evidence that the goods were in fact counterfeit.

Separate and apart from plaintiff's failure, defendants have presented affirmative evidence that plaintiff's predecessors had agreements with both Fenda and Westview, revealing that, at least at one point, Fenda and Westview were authorized to make or sell Altec Lansing products. Def. 56.1 ¶¶ 11, 15-16. Specifically, defendants produced evidence that an affiliate of Fenda previously had contracts with Altec Lansing Technologies, Inc. and Plantronics. Inc. to supply or produce Altec Lansing goods. Id. ¶¶ 15-16. Further, there is no evidence as to whether or when that arrangement was terminated. Moreover, defendants presented evidence that Fenda was listed as a top exporter of Altec Lansing products. Id. ¶ 17.

Similarly, the record contains an agreement between Westview and Plantronics, Inc., which allowed Westview to solicit orders

for Altec Lansing goods.  Id. ¶ 11; Nixon Decl. Ex. 5.  This is coupled with testimony from defendant Boyarsky that he knew that Westview and Steinberg were at least previously authorized to sell Altec Lansing products.  Def. 56.1 ¶¶ 36-37.

Finally, defendants have presented evidence that the speakers at issue were not the latest model, but older models that had been available since at least 2009.  Id. ¶ 32.  The fact that these were older models support defendants' argument that the speakers were produced while Fenda or Westview had a license to do so.

Given defendants' submissions, the burden shifts to plaintiff to establish a genuine issue of material fact.  To defeat a motion for summary judgment, the non-moving party must "set forth 'specific facts' demonstrating there is a 'genuine issue for trial.'"  Wright, 554 F.3d at 266.  As discussed previously, plaintiff failed to muster evidence that the goods were counterfeit.  Moreover, plaintiff failed to properly respond to defendants' Rule 56.1 statement by identifying specific evidence to rebut its assertions.  Even looking outside the Rule 56.1 statement, at most, all plaintiff can rely upon are the emails between Boyarsky and Steinberg and those between Steinberg and employees at Fenda.  While these emails reference "production" and "completion" of the products, the Court, as well as plaintiff, still do not know what was done by Fenda to "produce" the goods or

whether Fenda was permitted to produce the speakers at that time. "Though we must accept as true the allegations of the party defending against the summary judgment motion, drawing all reasonable inferences in his favor, conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996). In sum, on the record presented, defendants are entitled to summary judgment.

Having granted defendants' motion for summary judgment that the goods were not counterfeit, plaintiff cannot establish that it is entitled to any damages, let alone the enhanced damages for willful counterfeiting. That being said, the Court notes that the evidence is strong that any alleged counterfeiting was not willful.

As discussed, Boyarsky testified that he had a prior relationship with Westview and Steinberg and that he had known the two to be reputable sources from whom to purchase authentic goods. Def. 56.11 ¶¶ 34-35. Further, it is telling that, immediately upon receiving plaintiff's cease-and-desist letter, defendant responded that:

> [W]e have purchased the Altec Lansing speakers from Allen Steinberg at West-view industries he has a very close relationship with the infinity group and we have forwarded this to him. He assured us he will reach out to the the [sic] infinity group and will resolve any issues . . . For the time being we have removed our listing from Walmart.com.

Id. ¶ 42.  Not only did defendants express that they had purchased the goods from a group that had a relationship with plaintiff, but they immediately removed the items for sale, lest they be counterfeit.  These acts rebut any suggestion that defendants' conduct was willful.  Therefore, the Court grants defendants' motion for summary judgment in full.

## II.  Remaining Claims

In addition, plaintiff seeks summary judgment on the remaining four claims in the complaint.  For plaintiff to win on each claim, it is required to prove that the speakers sold by defendants were not authentic.  As discussed at length previously, plaintiff has failed to do so.  The Court briefly addresses each cause of action below and denies each of plaintiff's motions for summary judgement.

### a. False Advertising and Unfair Competition Under Section 43(a)(1)(B) of the Lanham Act

The Lanham Act imposes liability on "any person who, in connection with any goods or services . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of . . . another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B).  The challenged promotion must be either

literally false or likely to mislead or confuse consumers.  <u>Tiffany</u> <u>(NJ) Inc. v. eBay Inc.</u>, 600 F.3d 93, 112 (2d Cir. 2010).

Plaintiff argues that defendants' promotion of the speakers on Walmart.com was "literally false" as "the unambiguous message sent by this promotion was that Defendants offered for sale authentic Altec Lansing Products."  Pl. Br. at 12-13.  However, for all the reasons already outlined, plaintiff has not established that the products were inauthentic.[10]

### b. Injury to Reputation and New York State Anti-Dilution under New York General Business Law § 360-l

Plaintiff also moves for summary judgment on its anti-dilution claim under New York General Business Law § 360-l.  This requires that plaintiff show that plaintiff's mark is distinctive and that there is a likelihood of "blurring."  <u>Deere & Co. v. MTD</u> <u>Products, Inc.</u>, 41 F.3d 39, 42-43 (2d Cir. 1994).  Dilution by blurring occurs where "defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product."  <u>Id.</u> at 43.  "The ultimate question under New York law is whether there is a

---

[10] Plaintiff argues that, for this claim, "it is immaterial that the products may, at one point, have been authentic," because this "does not mean that they continued to be when the trademark owner, AL Infinity or its predecessor, withdrew its permission."  Pl. Br. at 13 n.1.  Ignoring the fact that the case cited by plaintiff involved a different section of the Lanham Act, plaintiff has presented no evidence that AL Infinity or its predecessors actually withdrew its permission from Fenda.

likelihood that the capacity of the senior owner's mark 'to serve as a unique identifier of its source' will be diminished." <u>Coty Inc. v. Excell Brands, LLC</u>, 277 F. Supp. 3d 425, 459 (S.D.N.Y. 2017) (quoting <u>Louis Vuitton Malletier v. Dooney & Bourke, Inc.</u>, 561 F. Supp. 2d 368, 393 (S.D.N.Y. 2008)).

Once again, there can only be a viable claim if defendant is in fact selling inauthentic goods. <u>See</u> <u>Ergowerx Intern., LLC v. Maxell Corp. of Am.</u>, 18 F. Supp. 3d 430, 451 (S.D.N.Y. 2014) (holding that "blurring cannot exist under N.Y. Gen. Bus. Law § 360-l when the products at issue are genuine"). As explained above, plaintiff has not proven that the goods were inauthentic, and thus, the Court denies plaintiff's motion for summary judgment.[11]

### c. Use of Name or Address with Intent to Deceive under New York General Business Law § 133

Similarly, plaintiff's motion for summary judgment under New York General Business Law § 133 fails. Section 133 provides that a person or company cannot use any name to deceive or mislead the public about the person's or company's identity, connection with another person or company, address, or location. N.Y. Gen. Bus.

---

[11] The Court also notes that the only remedy available under N.Y. Gen. Bus. L. § 360-l is injunctive relief, and therefore, it cannot provide any money damages sought by plaintiff. N.Y. Gen Bus. L. § 360-l ("Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief").

L. § 133.  While plaintiff only offers the conclusory argument
that "[d]efendants' conduct amounts to a violation," Pl. Br. at
15, plaintiff's claim once again rests on whether the goods were
authentic.  For all the reasons previously explained, plaintiff
has not proven that, and therefore the motion as to this claim is
likewise denied.

### d. Common Law Trademark Infringement and Unfair Competition

Finally, plaintiff seeks summary judgment on its state common
law trademark infringement and unfair competition claims, which
largely "mirror the Lanham Act claims." Lopez v. Gap, Inc., 883
F. Supp. 2d 400, 430 (S.D.N.Y. 2012) (quoting Lorillard Tobacco
Co. v. Jamelis Grocery. Inc., 378 F. Supp. 2d 448, 456 (S.D.N.Y.
2005)).  In light of the earlier ruling on Lanham Act claims, the
Court denies plaintiff's motion for summary judgment.[12]

### e. Summary Judgment to Non-Moving Party Under Rule 56(f)

The Court has the power under Rule 56(f) to "grant summary
judgment for a nonmovant," here defendants, "[a]fter giving notice
and reasonable time to respond." Fed. R. Civ. P. 56(f).  Having
found that plaintiff has not met its burden to prove that the goods
sold were counterfeit, the predicate for the remaining four causes

---

[12] Moreover, the unfair competition claim also requires a showing of bad faith.
Lopez, 883 F. Supp. 2d at 430-31.  For the same reasons that the Court held
that defendant did not act willfully with regards to counterfeiting, defendants
equally did not act in bad faith.

of action no longer exists.  In these circumstances, even though defendants have not moved, they are entitled to summary judgment on the remaining claims in the amended complaint.  Therefore, unless plaintiff can refute the Court's legal logic within 14 days, the Court will enter summary judgment for defendants on all causes of action.  To be perfectly clear, any submission from plaintiff may not seek to reargue the Court's decision that the record fails to establish counterfeiting.

### CONCLUSION

Accordingly, for the reasons stated above, plaintiff's motion for summary judgment is denied in its entirety and defendants' motion for summary judgment is granted.  The Clerk of the Court is respectfully directed to close the motions pending at ECF Nos. 60 and 70.

**SO ORDERED.**


Dated:    New York, New York
          August 9, 2023

                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

**SPA32**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
AL INFINITY, LLC,

       Plaintiff,      20 **CIVIL** 4813 (NRB)

   -against-          __JUDGMENT__

CROWN CELL, INC., HERSCHEL
SPALTER, ISSER BOYARSKY and
DOES 1-10,

       Defendants.
-------------------------------------------------------------X

    It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Memorandum and Order dated August 9, 2023, plaintiff's motion for

summary judgment is denied in its entirety and defendants' motion for summary judgment is

granted.

**Dated:**  New York, New York
    August 9, 2023


            RUBY J. KRAJICK
            Clerk of Court


      **BY:**
           _____
            **Deputy Clerk**

SPA33

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X
AL INFINITY, LLC,

                         Plaintiff,

           -against-                             20 **CIVIL** 4813 (NRB)

CROWN CELL, INC., HERSCHEL SPALTER,                                 **JUDGMENT**
ISSER BOYARSKY, and DOES 1-10,

                         Defendants.
--------------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in the

Court's Memorandum and Order dated May 1, 2024, in sum, even with a second bite of the apple, plaintiff has

done nothing to disturb any finding -- legal or factual -- that we made in our initial Order. As we explained

there, there was record evidence showing that the goods in question were supplied and distributed by authorized

entities and thus that the goods were not counterfeit. Plaintiff put forth no evidence, now or then, to dispute this

critical fact, even though the Court gave plaintiff significant time and opportunity to do so. Moreover, as we

noted in our initial Order, the absence of such evidence was striking given that this evidence would be

"uniquely within plaintiff's control." Order at 23. Based on our finding that the goods in question were not

shown to be counterfeit, we held that "the predicate for [plaintiff's] remaining four causes of action no longer

exists." Id. at 30-31. Even after giving plaintiff ample opportunity to refute this "legal logic," it remains firmly

intact, and therefore, we enter summary judgment for defendants dismissing all of plaintiff's causes of action.

Judgment is entered for defendants dismissing the complaint; accordingly, the case is closed.

**Dated:**  New York, New York

     May 1, 2024

                                              **RUBY J. KRAJICK**
                                      _____
                                         **Clerk of Court**

                  **BY:**        K. mango
                                      _____
                                         **Deputy Clerk**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
AL INFINITY, LLC,

                Plaintiff,

      - against -

CROWN CELL, INC., HERSCHEL SPALTER,
ISSER BOYARSKY, and DOES 1-10,

             Defendants.
------------------------------------X

**MEMORANDUM AND ORDER**

20 Civ. 4813 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff AL Infinity LLC ("AL Infinity" or "plaintiff"), the most recent owner of the Altec Lansing trademark, sued defendant Crown Cell, Inc. ("Crown Cell"), its founder Herschel Spalter ("Spalter"), and its employee Isser Boyarsky ("Boyarsky," and together with Crown Cell and Spalter, "defendants") after defendants sold two types of speakers bearing the Altec Lansing trademark. Plaintiff asserted five causes of action: (1) federal trademark counterfeiting under 15 U.S.C. § 1114; (2) federal trademark infringement under 15 U.S.C. § 1125(a); (3) injury to business reputation and state anti-dilution; (4) deceptive trade practices; and (5) common law unfair competition. See ECF No. 26.

As the Court has repeatedly made clear from the outset of this litigation, plaintiff's claims all turn on the fundamental question of whether the speakers in question were genuine or counterfeit. Indeed, plaintiff was given numerous opportunities,

including an extension of time to complete discovery, specifically to build its factual record so that it could eventually carry its burden of demonstrating that the speakers in question were in fact counterfeit. Although plaintiff did not avail itself of these opportunities, it nonetheless cross-moved for summary judgment on all its claims in response to defendants' motion for summary judgment only as to the first cause of action for counterfeiting.

On August 9, 2023, the Court issued a Memorandum and Order (the "Order") denying plaintiff's motion and granting defendants' motion because plaintiff "failed to present evidence that the goods were in fact counterfeit" and defendants "presented affirmative evidence" demonstrating that the speakers in question were supplied and distributed by entities that, "at least at one point," were "authorized to make or sell Altec Lansing products." ECF No. 83 at 24. Further, because plaintiff did not provide any evidence that such authorization was ever withdrawn, the Court concluded that plaintiff did not meet its burden of showing that the goods sold were not genuine. Id. at 28, 30. Based on this conclusion, the Court explained:

> [T]he predicate for [plaintiff's] remaining four causes of action no longer exists. In these circumstances, even though defendants have not moved they are entitled to summary judgment on the remaining claims in [plaintiff's] complaint. Therefore, unless plaintiff can refute the Court's legal

**SPA36**

```
logic within 14 days, the Court will enter summary judgment
for defendants on all causes of action.  To be perfectly
clear, any submission from plaintiff may not seek to reargue
the Court's decision that the record fails to establish
counterfeiting.
```

Id. at 30-31.  Thereafter, plaintiff made several submissions to
the Court, none of which refuted the legal logic of our initial
Order or otherwise disturbed our finding that plaintiff failed to
establish counterfeiting.  Thus, we will enter summary judgment in
favor of defendants on plaintiff's remaining claims.

**BACKGROUND**

**A.    Factual Background**

Given the Court's prior opinion, we assume familiarity with
the factual background of the case and state here only those facts
necessary to resolve the issues discussed herein.  As described in
our earlier opinion, plaintiff is the trademark owner of the
consumer electronics brand Altec Lansing, which manufactures,
imports, sells (or licenses to others to manufacture and sell)
consumer electronics.  Order at 9.[1]  Although the trademarks date
as early as 1956, plaintiff only acquired the rights in 2012.  Id.
Prior to that, the trademark was transferred between three

--------

[1] For ease of reference, we cite to our original Order, which, in turn,
contains citations to the underlying factual record.

-3-

different entities: (1) Altec Lansing Technologies, Inc.; (2) Plantronics, Inc.; and (3) Altec Lansing, LLC (collectively, "plaintiff's predecessors"). Id. at 1-2.

Critically, these predecessors had relationships with third-party defendant Westview Industries, Inc. ("Westview"), and with an affiliate of the Chinese company Shenzhen Fenda Technology Co., Ltd. ("Fenda") to distribute and supply Altec Lansing products. Id. at 2, 9. Indeed, as the Court explained in its original Order, the record contains several agreements between plaintiff's predecessors and a Fenda affiliate authorizing Fenda to supply certain Altec Lansing goods. Id. at 9-10. Likewise, the record shows that at least one of plaintiff's predecessors also had a relationship with Westview to distribute Altec Lansing goods. Id.

In 2016 and 2017, Crown Cell purchased two models of Altec Lansing speakers directly from Westview. Id. at 11. To supply Crown Cell with the speakers, Westview purchased them from Fenda. Id. Though it is unclear from the record exactly what Fenda did in order to supply the speakers to Westview, Westview eventually purchased from Fenda and sold to Crown Cell 10,456 units of the two speakers. Id. at 11-12. Once defendants received the speakers, they offered them for sale on Amazon.com and Walmart.com and ultimately sold 6,705 of the speakers. Id. at 12.

-4-

After plaintiff learned of defendants' sales, it sent a cease-and-desist letter to Crown Cell on May 4, 2017.  Id.  Crown Cell immediately complied with plaintiff's demand while noting that it had purchased the goods from what it thought to be a legitimate vendor.  Id. at 13.

**B.    Procedural History**

Plaintiff eventually filed suit and its operative complaint, as outlined above, asserts five causes of action: (1) federal trademark counterfeiting under 15 U.S.C. § 1114; (2) federal trademark infringement under 15 U.S.C. § 1125(a); (3) injury to business reputation and state anti- dilution; (4) deceptive trade practices; and (5) common law unfair competition.  See ECF No. 26. Defendants answered and then filed a third-party complaint against Westview on March 29, 2021.  ECF Nos. 27-28.

After more than a year of discovery, defendants sought leave to move for summary judgment on the federal counterfeiting claim, and their application was subsequently joined by third-party defendant Westview.  See ECF Nos. 45, 47.  However, plaintiff opposed the motion and requested additional discovery.  See ECF No. 46.  The Court then held a conference regarding defendants' proposed motion during which it explicitly addressed plaintiff's

-5-

burden to prove that the speakers in question were not genuine. The Court also inquired into whether plaintiff was planning to seek discovery from Fenda. Order at 3-4. Despite indicating its willingness to seek discovery from Fenda during the conference, plaintiff's subsequent proposal regarding the remaining discovery failed to include a schedule for discovery from Fenda. See ECF No. 48. The Court, in explaining the deficiencies in that proposal, once against reminded plaintiff of the "centrality" of a deposition of Fenda. ECF No. 51.

The Court eventually gave plaintiff another 90 days to complete discovery related to counterfeiting, at the conclusion of which defendants were permitted to make their motion. ECF No. 55. After the 90-day period elapsed, plaintiff, for the first time, sought permission to cross-move, and the Court entered a briefing schedule. See ECF Nos. 56, 59. Thereafter, each side filed its respective motions for summary judgment -- plaintiff on all its claims, and defendants only as to plaintiff's federal counterfeiting claim. See ECF Nos. 60-82.

As noted above, the Court issued its order on August 9, 2023, denying plaintiff's motion and granting defendants' motion because "despite the additional time to build a factual record, plaintiff has failed to establish the basic fact that the goods were

-6-

counterfeit." Order at 18. Moreover, the Court found that defendants "presented affirmative evidence that plaintiff's predecessors had agreements with both Fenda and Westview, revealing that, at least at one point, Fenda and Westview were authorized to make or sell Altec Lansing products." Id. at 24. Notably, the Court found no evidence suggesting that these arrangements were ever terminated. Id. At bottom, because there was undisputed evidence that the goods were produced and sold by authorized providers, they could not be considered to be counterfeit. See id. at 17-18 (citing cases).

The Court then addressed plaintiff's four remaining claims, noting that "[f]or plaintiff to win on each claim, it is required to prove that the speakers sold by defendants were [counterfeit]." Id. at 27. Because plaintiff had not met its burden to prove that the goods sold were counterfeit, the Court explained that "the predicate for the remaining four causes of action no longer exists," entitling defendants to summary judgment on the remaining claims. Id. at 30-31. Finally, plaintiff was given 14 days to "refute the Court's legal logic" though it was precluded from "reargu[ing] the Court's decision that the record fails to establish counterfeiting." Id. at 31.

# SPA41

On August 23, 2023, plaintiff filed a letter in response to the Court's Order, arguing that the remaining claims can and should survive because (1) "[i]t is undisputed that the goods in question were sold by a former licensee of the Altec Lansing brand after the expiration of the governing license agreement," and (2) the continued use of a mark by an ex-licensee can constitute a trademark infringement.  ECF No. 85 at 1-2.

In response, the Court filed a letter (the "Letter") stating that it "does not disagree with [plaintiff's] second point," but it "is not convinced that the first point is 'undisputed' or even supported by a factual record."  ECF No. 88 at 1.  The Court then reminded plaintiff that it had "presented no evidence that AL Infinity or its predecessors actually withdrew its permission from Fenda," id. at 2 (quoting Order at 28), and thus "the record presented to the Court did not contain evidence that Fenda was an ex-licensee and therefore that the goods were not genuine," id. Nevertheless, the Court stated "[i]f plaintiff has evidence showing that Fenda was an ex-licensee and that the goods were not genuine, plaintiff may file an additional brief and compliant Local Rule 56.1 statement within 30 days."  Id.  At the same time, the Court reiterated that its "willingness to accept supplemental

briefing should not be taken as an opportunity to reargue issues which have been decided." Id.

On October 17, 2023, plaintiff filed (1) a supplemental Rule 56.1 statement, ECF No. 90 ("Pl. 56.1"); (2) a supplemental declaration of Jeffrey Dweck ("Dweck Decl."), ECF No. 90-1; and (3) a supplemental memorandum of law, ECF No. 90-2 ("Pl. Mem."). On November 14, 2023, defendant filed (1) a response to plaintiff's supplemental Rule 56.1 statement, ECF No. 92 ("Def. 56.1"); and (2) a memorandum of law in response to plaintiff's supplemental memorandum of law, ECF No 91 ("Def. Opp.").

## DISCUSSION

### A.    Legal Standards

Summary judgment is properly granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56(f), the Court may "grant summary judgment for a nonmovant," here defendants, "[a]fter giving notice and reasonable time to respond." Fed. R. Civ. P. 56(f)(1). As outlined above, plaintiff has been given ample notice and time to explain why summary judgment should not be granted for defendants on plaintiff's remaining claims, namely: (1) federal trademark infringement under

-9-

15 U.S.C. § 1125(a); (2) injury to business reputation and state anti-dilution; (3) deceptive trade practices; and (4) common law unfair competition. As discussed in our Order, all of these claims necessarily fail if the goods in question are shown to be genuine. See Order at 27-30.

First, the Lanham Act imposes liability on "any person who, in connection with any goods or services . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of . . . another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). The challenged promotion must be either literally false or likely to mislead or confuse consumers. Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 112 (2d Cir. 2010).

Second, as to plaintiff's anti-dilution claim under New York General Business Law § 360-1, there can only be a viable claim if defendant is in fact selling non-genuine goods. See Ergowerx Int'l, LLC v. Maxell Corp. of Am., 18 F. Supp. 3d 430, 451 (S.D.N.Y. 2014) (holding that "blurring cannot exist under N.Y. Gen. Bus. Law § 360-l when the products at issue are genuine").

Third, plaintiff's deceptive trade claim under New York General Business Law § 133 requires a showing that defendants "use[d] any name to <u>deceive or mislead</u> the public about [the] company's identity, connection with another person or company, address, or location." N.Y. Gen. Bus. L. § 133 (emphasis added).

Finally, plaintiff's common law trademark infringement and unfair competition claims largely "mirror the Lanham Act claims." <u>Lopez v. Gap, Inc.</u>, 883 F. Supp. 2d 400, 430 (S.D.N.Y. 2012) (quoting <u>Lorillard Tobacco Co. v. Jamelis Grocery Inc.</u>, 378 F. Supp. 2d 446, 456 (S.D.N.Y. 2005)).

## B.  Application

In our original Order, we concluded that because plaintiff failed to demonstrate that the goods in question were counterfeit, the predicate for plaintiff's remaining four claims no longer existed. Order at 30-31. We then explained that unless plaintiff can "refute the Court's legal logic," we would enter summary judgment for defendants on all remaining claims. <u>Id.</u> at 31. Rather than even attempt to refute this legal logic, plaintiff has tried to reargue the factual record, claiming that that Fenda was never given permission to sell Altec Lansing products in the first place and therefore the goods in question are not genuine. Pl.

Mem. at 4-5.  This argument is without merit, and consequently we grant summary judgment for defendants on all causes of action.

As an initial matter, plaintiff's current effort far exceeds the parameters of the Court's grant of an opportunity to challenge the Court's "legal logic."  In both our initial and subsequent orders, we explicitly limited the scope of what plaintiff could raise at this juncture of the litigation.  See Order at 31 (making it "perfectly clear" that "any submission from plaintiff may not seek to reargue the Court's decision that the record fails to establish counterfeiting"); Letter at 2 (stating that this "should not be taken as an opportunity to reargue issues which have been decided").  Even still, we specifically invited plaintiff to put forth any "evidence showing that Fenda was an ex-licensee and that the goods were not genuine."  Letter at 2 (emphasis added). Despite this opportunity, plaintiff's submissions make no attempt to adduce evidence that Fenda (or Westview for that matter) was an ex-licensee.  Instead, plaintiff seeks only to reargue the factual issue of whether Fenda was ever given permission to sell Altec Lansing products in the first place.  This issue has already been decided, and plaintiff's attempt to reargue it is not condoned.

Moreover, our initial finding that Fenda had a license to manufacture Altec Lansing goods was well-supported by the record.

-12-

Relying on the record evidence, the Court noted that there were two agreements between plaintiff's predecessors and a Fenda affiliate to supply certain goods, which indicated that, at least at one point, Fenda was authorized to make Altec Lansing products.[2] See Order at 10-11, 24-26. Critically, the Court found that "there is no evidence as to whether or when that arrangement was terminated." Id. at 24. Furthermore, defendants presented evidence that Fenda was listed as a top exporter of Altec Lansing products and that the speakers at issue were older models, which supported defendants' argument that the speakers were produced while Fenda (and Westview) had a license to do so (even assuming such a license ever expired). Id. at 24-25. Based on these undisputed facts, the Court concluded that Fenda was authorized to supply the speakers and thus the speakers were not shown to be counterfeit.[3]

---

[2] We likewise concluded that a similar relationship existed between plaintiff's predecessors and Westview, Order at 24-26, but plaintiff does not attempt to reargue that conclusion.

[3] Plaintiff has also conceded on several occasions that Fenda was, in fact, an authorized manufacturer for at least some period of time. For example, in an early letter to the Court, plaintiff characterized Fenda as a "former distributor of Altec Lansing goods" and stated that the goods may have been counterfeit even though "a former distributor of the brand was involved." ECF No. 23 at 2. Likewise, in its summary judgment briefing, plaintiff acknowledged that "the products may, at one point, have been authentic Altec Lansing product," and claimed that this was "immaterial." ECF No 76 at 13 n.1.

Plaintiff's eleventh-hour attempts to undermine this conclusion fail. First, plaintiff suggests that although Fenda may have been authorized to <u>manufacture</u> the products, it never had the right to <u>sell</u> those products to Westview, an authorized distributor. Pl. Mem. at 3. This argument, which plaintiff has never raised before, belies common sense. Plaintiff fails to provide, and the Court cannot identify, any reason why a manufacturer such as Fenda would agree to manufacture products that it could not sell. Second, plaintiff seems to quibble with the entities listed in the manufacturing agreements upon which the Court relied. <u>Id.</u> at 4. However, in doing so, plaintiff does not articulate why its predecessors' agreements with Fenda's affiliates are not persuasive evidence that Fenda was an authorized manufacturer. Finally, plaintiff essentially contends that it was improper to rely on allegations in a complaint from a prior, unrelated lawsuit, but in making this argument, plaintiff ignores the fact that the Court expressly disclaimed any reliance on such allegations in reaching our conclusion.[4] Order at 10 n.3.

---

[4] Plaintiff's suggestion that defendants failed to adduce undisputed evidence of a licensing agreement lacks merit. Pl. Mem. at 3. Indeed, as the Court explained in its initial Order, "defendants have presented affirmative evidence that plaintiff's predecessors had agreements with both Fenda and Westview, revealing that, at least at one point, Fenda and Westview were authorized to make or sell Altec Lansing products." Order at 24. Plaintiff, now as before, has not put forth any evidence to create a genuine dispute over this highly material fact.

## CONCLUSION

In sum, even with a second bite of the apple, plaintiff has done nothing to disturb <u>any</u> finding -- legal or factual -- that we made in our initial Order. As we explained there, there was record evidence showing that the goods in question were supplied and distributed by authorized entities and thus that the goods were not counterfeit. Plaintiff put forth no evidence, now or then, to dispute this critical fact, even though the Court gave plaintiff significant time and opportunity to do so. Moreover, as we noted in our initial Order, the absence of such evidence was striking given that this evidence would be "uniquely within plaintiff's control." Order at 23. Based on our finding that the goods in question were not shown to be counterfeit, we held that "the predicate for [plaintiff's] remaining four causes of action no longer exists." <u>Id.</u> at 30-31. Even after giving plaintiff ample opportunity to refute this "legal logic," it remains firmly intact, and therefore, we enter summary judgment for defendants dismissing all of plaintiff's causes of action. The Clerk of Court is respectfully requested to terminate the motion pending at ECF No. 89, enter judgment for defendants dismissing the complaint, and close this case.

**SO ORDERED.**

Dated:    May 1, 2024
          New York, New York

_____
   NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE